IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COLORADO RIVER INDIAN TRIBES, | ) | |
| a federally recognized Indian Tribe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.1:04CV00010 (JDB) |
| | ) | |
| NATIONAL INDIAN GAMING COMMISSION, | ) | |
| *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

JANOV LAW OFFICES, P.C.

901 Rio Grande Blvd. NW, Suite F-144
Albuquerque, New Mexico 87104
Tel:    (505) 842-8302
Fax:    (505) 842-8309
Gwenellen P. Janov
Samuel D. Gollis, Of Counsel

THE SPERDUTO LAW FIRM, P.L.C.

2021 L Street, N.W., 2nd Floor
Washington, D.C.  20036
Tel:    (202) 408-8900
Fax:    (202) 408-8910
Kim Hoyt Sperduto (D.C. Bar # 416127)
Paola R. Guerrero

Eric N. Shepard, Acting Attorney General
COLORADO RIVER INDIAN TRIBES
Route 1 Box 23-B
Parker, Arizona 85344
Tel:   (928) 669-1271
Fax:  (928) 996-5675

*Attorneys for Plaintiff Colorado River Indian Tribes*

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT ............................................................................1

ARGUMENT ......................................................................................................7

POINT I        THE *CHEVRON* STEP I ANALYSIS CONCLUSIVELY
               DEMONSTRATES THAT THE COMMISSION DOES
               NOT HAVE THE STATUTORY AUTHORITY TO
               IMPOSE MANDATORY MICS ON CLASS III GAMING ................................7

               A.    The *Chevron* Framework .................................................7

                     1.    The Test......................................................7

                     2.    The Issue ....................................................8

POINT II       NOTHING IN § 2705 OR § 2706 PROVIDES THE
               COMMISSION WITH THE SUBSTANTIVE RULE-MAKING
               AUTHORITY TO IMPOSE MANDATORY CLASS III MICS .........................10

               A.    The Language And Structure Of § 2705 And § 2706 Reflect A
                     Statutory Scheme That Does Not And Was Not Intended To
                     Confer Authority On The Commission To Impose Mandatory
                     Internal Control Standards On Class III Gaming...........................10

               B.    The Commission's Non-Class Specific Powers Do Not
                     By Implication Make The Commission's Class II And Class
                     Iii Powers Co-Extensive.................................................13

POINT III      SECTION 2710(d) REFLECTS CONGRESS' CLEAR INTENTION
               TO CREATE ENTIRELY DIFFERENT REGULATORY REGIMES
               FOR CLASS II AND CLASS III GAMING ACTIVITY....................................15

POINT IV       THE AUTHORITY TO INVESTIGATE AND ENFORCE IS
               NOT THE SAME THING AS THE AUTHORITY TO LEGISLATE
               BY AFFIRMATIVE SUBSTANTIVE RULE-MAKING....................................18

POINT V        THE COMMISSION'S AUTHORITY TO REVIEW AND
               APPROVE CLASS III TRIBAL GAMING ORDINANCES
               AND MANAGEMENT CONTRACTS DOES NOT SUPPORT
               THE IMPOSITION OF MANDATORY CLASS III MICS ................................20

i

A.    Tribal Gaming Ordinances................................................................20

B.    Management Contracts ...................................................................22

POINT VI    THE BROAD PURPOSES OF IGRA CONFER NO
SUBSTANTIVE AUTHORITY ON THE NIGC TO
IMPOSE MANDATORY CLASS III MICS......................................................24

A.    Rejection Of The Commission's Attempt To
Impose Mandatory Class III MICS Would Not
Result In A Regulatory Void ..........................................................25

B.    The Case Law Does Not Support Defendants'
Heavy Reliance On Statutory Objectives. ....................................28

C.    A Catchall Authority To Promulgate Regulations
To Implement The Provisions Of The Act Does
Not Validate The MICS As Applied To Class III
Gaming, Even If The MICS Would Further
The Purposes Of IGRA...................................................................30

POINT VII    THE LEGISLATIVE HISTORY DEMONSTRATES
THAT CONGRESS HAD A SPECIFIC INTENTION
WHEN IT GAVE THE COMMISSION OVERSIGHT
RATHER THAN REGULATORY AUTHORITY OVER
CLASS III GAMING.................................................................................32

A.    The Legislative History Of IGRA Distinguishes
Between "Regulation" And "Oversight" ........................................32

B.    Nothing In The Legislative History Supports The
Commission's Position ...................................................................33

1.    The Commission Historically Has
Interpreted IGRA As Not Giving It The
Authority To Impose Mandatory Internal
Control Standards On Class III Gaming............................34

2.    Congress Has Repeatedly Declined To Amend
IGRA To Give The Commission The Authority
To Impose Mandatory Internal Control
Standards Over Class III Gaming .....................................36

POINT VIII    THE 1997 AMENDMENT OF § 2717 NEITHER CONFERRED
                 CLASS III AUTHORITY NOR REFLECTED CONGRESSIONAL
                 RECOGNITION THAT THE COMMISSION POSSESSES
                 BROAD AUTHORITY OVER CLASS III ACTIVITY......................................37

POINT IX      THE COMMISSION'S IMPOSITION OF
                 MANDATORY MICS IS NOT ENTITLED TO
                 DEFERENCE UNDER STEP II OF *CHEVRON*...................................................39

CONCLUSION.............................................................................................................................41

## TABLE OF AUTHORITIES

### Cases

*American Mining Congress v. U. S. Army Corps of Engineers,*
951 F. Supp. 267 (D.D.C. 1997), *aff'd*, 145 F.3d 1399 (D.C. Cir. 1998)...................28, 35, 36, 37

*American Trucking Ass'ns v. United States,*
344 U.S. 298 (1953)...........................................................................................................28, 29

*Artichoke Joe's California Grand Casino v. Norton,*
216 F. Supp. 2d 1084 (E.D. Cal. 2002).....................................................................................16

*Artichoke Joe's California Grand Casino v. Norton,*
353 F.3d 712 (9th Cir. 2003), *cert. denied*, 125 S.Ct. 51,
73 USLW 3197 (2004)...............................................................................................................17

*Chevron, USA, Inc. v.  Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984)........................................................................................................8, 39, 40

*City of Roseville v. Norton,*
348 F.3d 1020 (D.C. 2003), *cert. denied,* 124 S.Ct. 1888, 72 U.S.L.W. 3539 (2004)..................40

*Committee for Nuclear Responsibility, Inc. v. Seaborg,*
463 F.2d 783 (D.C. Cir. 1971)...................................................................................................39

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
532 U.S. 1  (2001)......................................................................................................................36

*Ethyl Corp. v. Environmental Protection Agency,*
51 F.3d 1053 (D.C. Cir. 1995)...................................................................................................28

*ETSI Pipeline Project v. Missouri,*
484 U.S. 495 (1988)...................................................................................................................30

*Keweenaw Bay Indian Community v. United States,*
136 F.3d 469 (6th Cir. 1998)...................................................................................................16

*Montana v. Blackfeet Tribe of Indians,*
471 U.S. 759 (1985)...................................................................................................................40

*National Wildlife Federation v. Interstate Commerce Commission,*
850 F.2d 694 (D.C. Cir. 1988)...................................................................................................40

*Rodriguez v. United States,*
480 U.S. 522 (1987)...................................................................................................................28

*Tennessee Valley Authority v. Hill,*
437 U.S. 153 (1978)...................................................................................................................38

**Statues and Regulations**

Indian Gaming Regulatory Act, 25 U.S.C.

§§ 2701-2721 (2001)................................................................................2

§ 2701 ..............................................................................................26

§ 2701(3) ...........................................................................................26

§ 2702 ..............................................................................................26

§ 2705................................................................................2, 3, 10, 13, 14, 18

§ 2705(a)(1) .........................................................................................13

§ 2705(a)(2) .........................................................................................14

§ 2705(a)(3) .........................................................................................13

§ 2705(a)(4) .........................................................................................13

§ 2706................................................................................2, 3, 10, 13

§ 2706(b) .........................................................................................13, 14

§ 2706(b)(1) .................................................................................12, 13, 15, 18

§ 2706(b)(2) .................................................................................12, 13, 15, 18

§ 2706(b)(3) .........................................................................................21

§ 2706(b)(4) .........................................................................10, 11, 12, 13, 15, 18

§ 2706(b)(10) .......................................................................................30,31

§ 2710................................................................................3, 15, 18

§ 2710(b) ...........................................................................................15

§ 2710(b)(2)(C) .....................................................................................21

§ 2710(b)(2)(E)) ..................................................................................11, 24

§ 2710(b)(F) .........................................................................................20

§ 2710(c)(1) ...........................................................................................................21

§ 2710(c)(2) ...........................................................................................................21

§ 2710(d) .........................................................................................14, 15, 18, 23

§ 2710(d)(1)(A)(ii) ........................................................................................11, 21

§ 2710(d)(1)(B) .....................................................................................................16

§ 2710(d)(3)(B) ........................................................................................15, 17, 30

§ 2710(d)(3)(B) .....................................................................................................15

§ 2710(d)(3)(C) ..............................................................................................15, 30

§ 2710(d)(5) ....................................................................................................16, 17

§ 2710(d)(7)(B)(vii) .............................................................................................17

§ 2717(a) (2001) ...................................................................................................37

§ 2710(d)(8) ....................................................................................................17, 31

§ 2710(d)(9) ...........................................................................................................23

§ 2711 ...............................................................................................................22, 23

§ 2711(a) ................................................................................................................23

§ 2711(b)(2) ...........................................................................................................24

§ 2711(b)(4) ...........................................................................................................24

§ 2717 ...............................................................................................................10, 12

Pub. L. No. 105-83, Title I, § 123(a)(1), 111 Stat. 1566 (Nov. 14, 1997),

    codified at 25 U.S.C. § 2717 .......................................................................37

Minimum Internal Control Standards, 25 C.F.R. Part 542

    § 542.4(b) .........................................................................................................31

    § 542.4(c) .........................................................................................................31

§ 542.13(o)(7)(iv) ........................................................................................................9

§ 542.13(o)(7)(vii)........................................................................................................9

**Legislative Material**

*Report of the Indian Affairs Committee*, S. Rep. No. 446, 100th Cong., 2d Sess.
(Aug. 3, 1998) *reprinted in* 1988 U.S.C.C.A.N. 3071 ................................................27

**Other Material**

Colorado River Indian Tribes Gaming Code (2004).........................................3, 18, 31

2003 Tribal-State Class III Compact Between CRIT and the State of Arizona ...............26, 40, 41

Appendix H...................................................................................................40, 41

Tribal Internal Controls Standards.................................................................40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COLORADO RIVER INDIAN TRIBES,  )
a federally recognized Indian Tribe,  )
                               )
        Plaintiff,             )
                               )
v.                             )        Case No. 1:04CV00010
                               )                (JDB)
NATIONAL INDIAN GAMING COMMISSION,  )
*et al.,*                       )
                               )
        Defendants.            )
                               )
                               )
_____)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

Plaintiff Colorado River Indian Tribes ("CRIT" or "the Tribe") respectfully submits this Reply Memorandum of Law in Further Support of its Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment.

**INTRODUCTORY STATEMENT**

Defendants ("Defendants") have cobbled together a superficially attractive theory to justify the National Indian Gaming Commission's ("NIGC") usurpation of regulatory power that Congress did not confer. On closer examination, however, that theory is revealed for what it is: a patchwork of policy and enforcement provisions in aid of substantive authority that does not exist.

Reduced to its basics, Defendants' Brief ("Def. Br.") advances eight circular and interrelated arguments. First, Defendants essentially ignore the analysis required by

*Chevron*.  Addressing whether the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (2001) ("IGRA" or "the Act") speaks directly to the subject of the rules and standards that are to govern the regulation and operation of Class III gaming, Defendants concede that nothing in the Act expressly gives that authority to the Commission.  (Def. Br. at 13, 34).  With that concession, Defendants conclude their inquiry into whether Congress has directly spoken to the subject.  Instead, they focus on the reasonableness of the MICS.  By failing to pursue the question of whether IGRA delegates Class III regulatory authority elsewhere, Defendants avoid having to confront the fact that conclusively determines this case:  Congress *has* spoken directly by delegating the substantive operational regulation of Class III gaming to the tribes and states through the mechanism of the tribal-state compacts.  (Pt. I, *infra*).

Defendants' second argument is that §§ 2705 and 2706, the two sections of IGRA that set out the Commission's and the Chairman's powers, must be read to "understand the implied reference to both classes of gaming from the statute's context."  (Def. Br. at 29).  It appears that Defendants mean by this that all of the provisions of both of those sections must be read as applying to both Class II and Class III gaming, regardless of the statute's actual language.  In its initial brief ("Pl. Init. Br."), the Tribe noted the significance of the fact that certain provisions in §§ 2705 and 2706 grant both Class II and Class III authority, while others grant only Class II authority.  Defendants' response to this argument is to point out that other provisions of those same sections grant authority to the Commission and its Chairman without reference to either class of gaming.  From these class neutral powers, Defendants would have this Court infer that Congress intended the Commission to have co-extensive, broad authority over both Class

II and Class III activity, despite the plain language of the statute.  As demonstrated below, such an interpretation is flatly inconsistent with the plain language of IGRA and cannot be sustained.  (Pt. II, *infra*).

Defendants make the requisite assertion that the statutory scheme of IGRA supports their interpretation of the Commission's authority, (Def. Br. at 26-36), but their analysis does little to clarify how they reach that conclusion.  Indeed, while emphasizing their "holistic" reading of § 2705 and § 2706, Defendants give short shrift to § 2710, the heart of Congress' plan for Class III gaming.  That section crystallizes the different regulatory schemes intended for Class II and Class III activity.  (Pt. III, *infra*).

The fourth major theme of Defendants' brief focuses on the Commission's investigative and enforcement powers.  Defendants repeatedly point to the Commission's authority to investigate, issue subpoenas, assess fines, and issue closure orders, some but not all of which are set out in class-neutral language.  From this fact, Defendants conclude that the Commission must have broad authority over Class III activity, otherwise it would have nothing to investigate and enforce.  As the Tribe has acknowledged throughout, the Commission *does* have an expressly conferred, albeit limited, role in connection with Class III activity, and the Commission may use its investigative and enforcement powers to deal with violations clearly within its power. The flaw in Defendants' argument is that they mistakenly equate the power to enforce rules with the power to make rules.  The Commission may not bootstrap its Class III authority in that way. (Pt. IV, *infra*).

Defendants also argue that the Chairman's obligation to review and approve Class III tribal gaming ordinances and Class III management contracts gives the Commission

the "authority to regulate" those ordinances and contracts.   (Def. Br. at 19).   By "regulate," Defendants mean that the Commission has the right to inspect, examine, audit, monitor, and impose substantive conditions on every one of the subjects that must be in the tribal gaming ordinance or management contract.   If carried to its logical conclusion, this purported statutory grant of authority would permit the NIGC to regulate, oversee, and intrude on virtually every aspect of tribal self-government.   To state the premise is to refute it.  (Pt. V, *infra*).

The sixth insistent theme of Defendants' argument is that the Class III MICS are a valid exercise of the Commission's delegated rule-making authority because the MICS are a "useful tool" to further IGRA's broad statutory purposes.   This sweeping assertion of rule-making authority cannot be upheld.   Defendants mistakenly equate federal regulation, embodied in IGRA, with Commission regulation.   They are not the same thing.   Like investigative and enforcement powers, an agency's rule-making authority can be exercised only in the service of the agency's lawful, delegated substantive authority.   Appropriate internal control standards surely contribute to the statutory purpose of minimizing the influence of organized crime, but so too would a policy of interning all organized crime dons at Guantanamo.   Both actions would serve the broad purposes underlying IGRA, but neither is within the Commission's statutory authority. The Commission's "ends justify the means" argument cannot stand.

An agency's rule-making activity must not only serve the purposes of its authorizing statute, but it must honor the means Congress chose to meet those purposes. Congress exercised federal regulation over the subject of tribal governmental gaming by enacting IGRA and assigning different roles to each of the three relevant governments.

No one government's authority is co-extensive with the full extent of the "federal regulation" exercised by Congress.  Thus, Defendants improperly focus on whether the authority the Commission seeks to exercise comports with the purposes of the Act. Instead, the inquiry must be whether Congress assigned that particular implementing authority to the Commission, or whether Congress assigned that authority elsewhere.  In this case, Congress assigned the operational regulation of Class III gaming to the tribes and states through the compacting process.  The imposition of mandatory Class III MICS interferes with the congressional scheme.  (Pt. VI, *infra*).

Defendants also argue that rejection of the Commission's Class III MICS authority would result in a "huge regulatory void" because "there would be no internal control requirements in many states."  (Def. Br. at 10).  The absence of Commission-imposed MICS does not translate to a regulatory void.  Regardless of the presence or absence of an express reference to internal controls in any particular tribal-state compact, every tribe's Class III gaming operation is subject to the regulatory jurisdiction of both the tribal and state regulatory authorities, to a greater or lesser degree.  Most importantly, the variation of regulatory detail from tribe to tribe and state to state is exactly what Congress foresaw and intended.  Within the system of tribal-state compacts, each tribe is free to negotiate with its state the form and substance of their joint regulation.  As contemplated by this concept of regulation by compact, CRIT and at least three of the *amici* supporting CRIT's position here have *voluntarily* adopted the MICS as the internal control standards required by their tribal-state compacts, as have other tribes across the country.  Others have not.  Nonetheless, the variety of approaches does not reflect a regulatory gap into which the Commission may lunge with a heavy hand.  To the

contrary, it comports completely with Congress' intention to leave the regulatory scheme to the wisdom and needs of each individual tribe and state.  (Pt. VI.A, *infra*).

In addition to these pervasive themes, Defendants raise two other arguments that are of less consequence and of equally little merit.  First, Defendants argue that for purposes of IGRA and the Commission's Class III authority, the terms "regulation" and "oversight" are "nearly synonymous," and therefore the Commission has broad authority over both Class II and Class III activity.  This theory is flatly belied by the language of the Senate Committee Report on the bill that became IGRA.  That report betrays a knowing and conscious distinction between the two terms, which cannot be obscured by Defendants' resort to Webster's dictionary.  (Pt. VII, *infra*).

Defendants' other secondary argument asserts that the Commission's broad authority over Class III gaming is reflected and confirmed by the 1997 amendment that allowed the Commission to assess fees on Class III gaming.  That amendment proves nothing more than this:  that because of the exponential growth of tribal governmental gaming between 1988 and 1997, the Commission's funding and staff were overwhelmed by the Commission's legitimate Class III duties.  (Pt. VIII, *infra*).

Finally, although agreeing with the Tribe that it is unnecessary, Defendants argue that if the Court finds it necessary to reach the second step of the *Chevron* analysis, the Commission's imposition of mandatory MICS on Class III gaming is a permissible construction of IGRA.  It is not.  Little deference is accorded to an agency when it is interpreting the outer boundaries of its own statutory authority.  All of the Tribe's arguments concerning statutory language, structure, and history demonstrate that the

Commission's interpretation conflicts with the clearly articulated intention of Congress. (Pt. IX, *infra*).

If the Commission believes that it needs a more substantive role to protect Class III gaming – and the Tribe does not doubt the fervency of the Commission's belief – the answer is not to usurp that power despite the clear strictures of IGRA.  The answer is to go to Congress and demonstrate why the Commission now needs and deserves more authority over Class III gaming activity than the authority Congress saw fit to give it in 1988.

Accordingly, for the reasons set forth in its initial brief and more fully set forth below, as well as for the reasons argued in the three briefs of *amici curiae*,[1] the Tribe respectfully submits that its Motion for Summary Judgment should be granted and that Defendants' Cross-Motion for Summary Judgment should be denied.

## ARGUMENT

## POINT I

### THE *CHEVRON* STEP I ANALYSIS CONCLUSIVELY DEMONSTRATES THAT THE COMMISSION DOES NOT HAVE THE STATUTORY AUTHORITY TO IMPOSE MANDATORY MICS ON CLASS III GAMING

A.    The *Chevron* Framework.

1.    The Test.  Given the dust raised in Defendants' brief, it does well to reiterate the test against which the Commission's claim of authority must be measured. That test is not, as Defendants in numerous places argue, whether the MICS reasonably relate to IGRA's purposes.  (Def. Br. at 5-6, citing cases that either predate or do not

---

[1]Briefs were filed in support of the Tribe's position by the National  Indian Gaming Association ("NIGA Br."); the Oneida Tribe of Wisconsin ("Oneida Br."); and the Spokane Indian Tribe, Shoalwater Bay Indian Tribe,  Coquille Indian Tribe, Shoshone & Bannock Indian Tribes, the Rincon Band of Luiseno Indians, and the Confederated Tribes of Siletz Indians of Oregon ("Spokane Br.").

mention *Chevron*).    The extent of the Commission's statutory authority must be examined under the two-part test of *Chevron, USA, Inc. v.  Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the . . . statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842-43 (footnotes deleted).

The Tribe and Defendants agree that the analysis under Step I of *Chevron* disposes of the question here.  (Def. Br. at 13).  How Defendants apply that test and conclude that the Commission has the requisite authority, however, is a mystery.  Although they parrot the standard and purport to use the customary tools of statutory language, statutory structure, and statutory history, their analysis is circular and weightless.  After all the dust has settled, Defendants concede that IGRA contains no substantive grant of authority to the Commission, and ignore the fact that the authority they seek has been expressly delegated elsewhere.

2.    The Issue.    Defendants paint their argument with a broad brush. Mischaracterizing the Tribe's position as arguing for a total absence of Class III regulatory authority in the Commission, Defendants counter the straw man they have created by devoting their brief to the proposition that the Commission has broad authority

over Class III gaming.  The Tribe does not agree with that statement, but that is not the issue.[2]

The particular issue is whether in IGRA Congress gave the Commission authority to impose mandatory internal control standards on Class III operations.  As Defendants' brief demonstrates in painstaking detail, the MICS are controls and rules that apply to the most minute details of a tribal gaming operation.  They govern how many and which employees must sign fill slips; who may have access to which sensitive areas of a casino; which supervisory personnel must be present on the gaming floor and may authorize the exchange of currency; and what kinds of surveillance and lock and key safeguards are required.  (Def. Br. at 8-10).  Other examples of the mundane level of operational detail include how many copies of credit withdrawal slips must be made and into which drawer such slips must be placed. *See, e.g.*, 25 C.F.R. § 542.13(o)(7)(iv), (vii).

The MICS are, pure and simple, intrusive regulatory standards that effectively micromanage the day-to-day conduct of the Tribe's Class III gaming operation.  The Tribe reiterates its recognition of the need for and value of such internal controls.  It opposes only their emanating as mandatory rules from the Commission.  Thus, the appropriate inquiry is whether Congress specifically addressed the precise issue of such standards.  Defendants concede that nothing in IGRA expressly delegates to the Commission the authority to impose such standards.  ( Def. Br. at 13, 34).  What they fail to acknowledge is that IGRA *does* expressly delegate this authority in a way that occupies the field, leaving no role for NIGC mandatory rulemaking on the subject.

---

[2]The Tribe has never taken the extreme position that the Commission has *no* authority to oversee and issue regulations concerning anything relating to Class III activity.  To the extent that any statement in its opening brief might be interpreted to suggest such a position, the Tribe confirms that such is not its intention.

**POINT II**

**NOTHING IN § 2705 OR § 2706 PROVIDES THE COMMISSION
WITH THE SUBSTANTIVE RULE-MAKING AUTHORITY
TO IMPOSE MANDATORY CLASS III MICS**

A.    The Language And Structure Of § 2705 And § 2706 Reflect A Statutory Scheme
That Does Not And Was Not Intended To Confer Authority On The Commission
To Impose Mandatory Internal Control Standards On Class III Gaming.

In its initial brief, the Tribe parsed the language of § 2705 and § 2706, noting how

in some places the statute expressly granted the Chairman or Commission authority over

both Class II and Class III matters and in others expressly limited the grant of authority

to Class II.  (Pl. Init. Br. at 14-17).   The Defendants' response effectively ignores the

plain language of those sections.

Defendants' discussion of § 2706(b)(4) is particularly troubling.  That subsection,

setting forth one of the Commission's enumerated powers, provides that the Commission

> (4) may demand access to and inspect, examine,
> photocopy, and audit all papers, books, and records
> respecting gross revenues of class II gaming conducted on
> Indian Lands and any other matters necessary to carry out
> the duties of the Commission under this Chapter.

Defendants first contend that this provision gives the Commission broad authority to

conduct audits to verify the accuracy of a tribe's § 2717 fee payments.  Defendants argue

as follows:

> The emphasis Congress placed on authorizing access to
> gross gaming revenue records reveals Congress' intent to
> provide the Commission a means to ensure compliance
> with the fee assessment provision.   Certainly the
> Commission would need access to records to determine
> whether a tribe has submitted an adequate fee payment
> consistent with its gross revenue.

(Def. Br. at 15-16).  Regardless of the "emphasis" Defendants claim to divine from the statute, Congress evinced no such intent.  Section 2706(b)(4) grants the Commission access to records respecting "gross revenues of *Class II gaming*."  Defendants' suggestion that the section can be read to grant access to Class II *and Class III* records respecting gross revenues simply ignores the plain language of the statute.  Had Congress intended to grant broad access concerning both classes of gaming, it would have said so by making specific reference to both Class II and Class III - as it did in § 2705.

The Tribe's interpretation of § 2706(b)(4) does not, as Defendants would have this Court believe, "remove the NIGC's ability to verify its fee collection results from the gaming operations that contribute most of its revenues."  (Def. Br. at 16).  Every tribal gaming operation is required to submit to the Commission an annual financial audit prepared by an independent certified public accountant.  The requirement applies to both Class II and Class III operations.  §§ 2710(b)(2)(C), 2710(d)(1)(A)(ii).  That annual independent audit gives the Commission more than adequate means to verify the fee payments for both classes of gaming.  Further, if the Commission, upon reviewing the audit, suspects a violation of IGRA or the Commission's validly issued regulations, at *that* point the Commission might arguably invoke its investigative powers to look further.

Once again, it is imperative to bear in mind what the MICS are and how this case arose.  The MICS are detailed rules governing the operational minutiae of a tribe's gaming facility.  They govern, among other things, slot machine fills, table game procedures, and the provision of and accounting for complimentary services.  The MICS

compliance audit the NIGC sought to conduct was not a routine accountant's audit pursuant to generally accepted accounting principles.  In its letter to CRIT's Tribal Chairman giving advance notice of the audit, the NIGC explicitly described it as an audit specific to CRIT's compliance with the operational controls required by the MICS. (US3175).  To suggest that the MICS, and the audit to measure a tribe's compliance with the MICS, would somehow assist the Commission in verifying the accuracy of the annual § 2717 fee payment is absurd.  Even more absurd is the suggestion that the NIGC would be unable to verify the § 2717 fee payments without mandatory MICS.

Defendants are absolutely correct that the Tribe is asking this Court to "disregard the NIGC's interpretation of the statute it is tasked with administering."  (Def. Br. at 16). The NIGC's interpretation is illogical and openly belied by the plain language of the statute.  It may well be that § 2706(b)(4) *does* deprive the Commission of *any* authority to inspect, examine, or audit Class III gaming activities.  Sections 2706(b)(1), (2) and (4) are so clearly directed at Class II activity that it would not be unreasonable to take such a broad view.  The Court, however, need not go that far to sustain the Tribe's position. Even if the second clause of § 2706(b)(4) can be read to give the Commission some inspection authority over Class III records under appropriate circumstances, those circumstances must still be "necessary to carry out *the duties of the Commission* under [IGRA]."  That clause can be interpreted to authorize the Commission to conduct a MICS audit *only* if the imposition of mandatory Class III MICS falls within "the duties of the Commission" in the first place.  The substantive regulation of Class III gaming, including the definition, imposition, and enforcement of internal control standards, is not

within the Commission's authority.  The MICS therefore cannot trigger inspection and audit of the Tribe's Class III books and records under § 2706(b)(4).

B.    The Commission's Non-Class Specific Powers Do Not By Implication Make The Commission's Class II And Class III Powers Co-Extensive.

Addressing the structure of IGRA, Defendants contend that a "holistic" view of § 2705 and § 2706 "leave[s] the interpreter to understand the implied reference to both classes of gaming from the statute's context."  (Def. Br. at 29).  CRIT agrees that certain provisions in IGRA are non-class specific and therefore, depending on context, may be read to apply to both Class II and Class III activity.  CRIT does not agree, however, that any notion of "implied reference" permits §§ 2706(b)(1), (2), or (4) to be read as if the words said "Class II and Class III gaming" instead of "Class II gaming."

After accurately reciting the Commission's powers under § 2706(b), Defendants return to the nub of subsection 2706(b)(4).  As described above, *supra* at 10, that provision authorizes the Commission to inspect and audit books and papers "respecting gross revenues of class II gaming . . . and any other matters necessary to carry out the duties of the Commission under this chapter."  Defendants contend that "the only rational reading" of that section "allows the NIGC the listed investigative powers when necessary to carry out the duties of the Commission respecting both class II and class III gaming." (Def. Br. at 28).  Defendants then engage in a protracted discussion of why the canon of *ejusdem generis* should not apply to the interpretation of § 2706(b).

Defendants next turn to § 2705, which sets out the powers of the Chairman.  As Defendants correctly observe, that section refers specifically to "class II and class III gaming" in subsections (a)(3) (ordinance approval) and (a)(4) (management contract approval), but refers to no specific class of gaming in subsections (a)(1) (closure orders)

13

and (a)(2) (civil fines).  Arguing that Congress in § 2705 "impliedly referred to both class II and class III gaming" in the section, they conclude that "Congress intended for both class II and class III to be affected by all of 2705."  (Def. Br. at 29).

Defendants' analysis muddles what is unmistakably clear language and a straightforward and coherent statutory scheme.  Section 2705 gives the Chairman a review and approval role over both Class II and Class III ordinances and management contracts.  That role is confirmed in § 2710(d).  Section 2705 further gives the Chairman enforcement authority over matters substantively delegated to him.  The fact that the enforcement authority is non-class specific cannot rationally be read as conferring plenary authority over *all* Class III gaming regardless of the specific provisions elsewhere in the statute.

Section 2706(b) is similarly straightforward.  It gives the Commission monitoring, inspection, and audit authority over *Class II* premises and activity.  The limitation is starkly emphasized by the unambiguous grant of powers relating to "class II gaming and class III gaming" in the immediately preceding section.  No amount of "holistic" analysis or "implied references" can diminish the simple fact that had Congress intended to grant the Commission the broad authority to monitor, inspect, and audit Class III premises, books, and records, it would have said so clearly in § 2706(b) using the same language it used in § 2705.

**POINT III**

**SECTION 2710(d) REFLECTS CONGRESS' CLEAR INTENTION TO
CREATE ENTIRELY DIFFERENT REGULATORY REGIMES FOR
CLASS II AND CLASS III GAMING ACTIVITY**

The structure of Section 2710 embodies Congress' intention to treat Class II and Class III gaming in substantially different ways. Section 2710(b) sets out the basic regulatory scheme for Class II, which calls for the joint regulation by the tribe and the NIGC. The active regulatory role conferred on the NIGC in that section is fleshed out in §§ 2706(b)(1), (2), and (4), which give the Commission the express authority to monitor, inspect, and audit virtually all aspects of a tribe's Class II gaming operation.

The heart of Class III gaming is defined in § 2710(d). The scheme for Class III activity is entirely different from that for Class II. Section 2710(d) establishes a complex compacting regime between the tribes and the states unlike anything contained in § 2710(b). The importance of the explicit regulatory aspect of the compacting process cannot be overstated. The tribes are directed to enter into a tribal-state compact "governing [Class III] gaming activities on Indian lands." § 2710(d)(3)(B). The compact is to include provisions relating to "(i) . . . laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and *regulation* of such [Class III] activity"; (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and *regulations*"; (iii) the assessment by the State of such activities in such amounts as are necessary to defray the cost of *regulating* such [Class III] activity; . . . (vi) *standards for the operation* of such activity and maintenance of the gaming facility . . ."; and (vii) any other subjects that are *directly related to the operation of [Class III] gaming activities.*" §2710(d)(3)(C)

(emphasis added). The statute further provides that "[n]othing in this subsection [2710(d)] shall impair the right of an Indian tribe to *regulate class III gaming on its Indian lands concurrently with the State*, except to the extent that such regulation is inconsistent with, or less stringent than, *the state laws and regulations* that are made applicable by any Tribal-State compact . . . ." § 2710(d)(5) (emphasis added). In the key provisions governing the meat of Class III, the only role assigned to the NIGC relates to gaming ordinances, management contracts, annual audits, and licensing.

None of the cases Defendants cite to justify the Commission's sweeping assumption of undelegated authority supports their position. In *Keweenaw Bay Indian Community v. United States*, 136 F.3d 469 (6th Cir. 1998), the question was not the significance of class-neutral provisions, but whether, once a compact was in effect, Class III gaming was subject any longer to IGRA at all. The tribe argued that its compact with the state rendered all of the other provisions of IGRA inapplicable. That is not what CRIT argues here.

Nor does either of the *Artichoke Joe's* opinions support the Commission's assertion that the "cooperative federalism" established by IGRA implies an active, "ever-present" NIGC role in Class III gaming. The issue in *Artichoke Joe's* was whether a statewide ballot proposition constituted an adequate state law basis under § 2710(d)(1)(B) to permit Class III gaming in California. The courts there had no occasion to and did not rule on the extent of the NIGC's Class III authority. Even so, in the context of summarily explaining IGRA's tripartite regulatory scheme, both courts used language that supports, not defeats, the Tribe's argument here. In *Artichoke Joe's California Grand Casino v. Norton*, 216 F. Supp. 2d 1084, 1093 (E.D. Cal. 2002), the district court noted that under

the tribal-state compact, "the federal government *cedes* its primary regulatory oversight role over Class III Indian gaming, and permits states and Indian tribes to develop joint regulatory schemes through the compacting process." (Emphasis added). The Ninth Circuit Court of Appeals echoed the concept of the federal cession of Class III regulatory authority to the tribes and states, observing:

> IGRA . . . devised a method to give back [to the states] some of the regulatory authority that the Supreme Court had held inapplicable to Indian Lands. . . . One of the bases of the holding in *Cabazon* was that Congress had not explicitly ceded regulatory authority for gaming to the states in Pub. Law No. 280 or otherwise. IGRA responded by creating a statutory basis for gaming regulation that introduced the compacting process as a means of sharing with the states the federal government's regulatory authority over Class III gaming.

*Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 721-22 (9th Cir. 2003), *cert. denied*, 125 S.Ct. 51, 73 U.S.L.W. 3197 (2004). Thus, rather than supporting Defendants' position, the "sharing" of regulatory authority noted by the Ninth Circuit in fact recognizes that Congress intended to *cede* the federal government's regulatory authority over Class III to the tribes and the states. That is why § 2710(d)(5) speaks in terms of concurrent *tribal* and *state* regulation, not tribal, state, *and federal* regulation.

   As the Tribe argued in its Initial Brief, the Commission's limited role in Class III regulation is underscored by the fact that IGRA designates the Secretary of the Interior, not the Commission, as the federal authority with the substantive role in Class III matters. (Pl. Init. Br. at 20-21). *See* § 2710(d)(3)(B), § 2710(d)(8) (approval of tribal-state compact) and § 2710(d)(7)(B)(vii) (power to authorize a tribe to conduct Class III gaming pursuant to Secretarial Procedures if state refuses to enter into a tribal-state compact). Defendants respond to this observation on the Secretary's unassailably

17

paramount role with an *ex cathedra* opinion on why the Secretary bears those responsibilities.  (Def. Br. at 26).  Even were Defendants' unsupported hypothesis correct, the fact remains that it is the Secretary, not the Commission, who has the direct authority to permit or prohibit a tribe's Class III gaming through her role in compact review and Secretarial Procedures.  This role underscores that Class III regulation is centered in the compact.  It can be no coincidence that in the absence of a compact, the initial regulatory role does not default to the Commission; it goes directly to the Secretary.

The congressional intention is unmistakable.  Section 2710 delegated nearly all of the regulatory authority over Class III to the tribes and the states.  The vestigial areas in which the Commission may exercise authority were defined explicitly in § 2705.  The expansive delegation of regulatory power to the tribes and states contained in § 2710(d) is consistent with the absence of any reference to Class III activity in §§ 2706(b)(1), (2), and (4); Congress did not intend the Commission to have the same authority to monitor, inspect, and audit Class III activity the Commission has for Class II.  Try as it might, the Commission cannot rationalize away the different language and statutory schemes that Congress imposed on the two classes of gaming.

## POINT IV

### THE AUTHORITY TO INVESTIGATE AND ENFORCE IS NOT THE SAME THING AS THE AUTHORITY TO LEGISLATE BY AFFIRMATIVE SUBSTANTIVE RULE-MAKING

Defendants seek to justify the Commission's Class III MICS authority by frequently invoking the Commission's enforcement and investigatory powers.  (*See* Def. Br. at 2, 13, 14, 18, 20, 21, 22, 26, 27, 28, 30, 31).  Pointing to the Commission's

authority to inspect, to subpoena, and to issue civil fines and closure orders, Defendants state that "[t]hese provisions establish an extensive regulatory scheme, and the NIGC is the only civil law enforcement agency with the authority to enforce against violations of all of these laws." (Def. Br. at 14). As best as the Tribe can understand this tautological statement, the argument is that the Commission is the only agency that can enforce the enforcement provisions of IGRA. Whatever the argument may mean, it does not support any authority in the Commission to impose mandatory Class III MICS.

CRIT does not dispute that the NIGC may exercise its investigatory and enforcement powers against a tribe for certain violations of IGRA that arise out of Class III gaming. For example, if a tribe conducts Class III gaming without a duly approved compact, ordinance, or management contract, the Commission may unquestionably take enforcement action. Similarly, if a tribe fails to submit its annual audit to the Commission, the Commission may take enforcement action. Nonetheless, the power to investigate and enforce is not a grant to legislate the substantive rules whose violation triggers investigation and enforcement. To say that the Commission's non-class specific investigative and enforcement authority permits it to create mandatory standards for Class III activity is tantamount to saying that state law enforcement officials, by virtue of their investigative and enforcement authority, can promulgate rules penalizing behavior that the legislature has not seen fit to criminalize.

The Commission has it the wrong way around. Investigative and enforcement powers may be used in the service of specific authority the Commission has been expressly granted. Those powers do not grant the Commission license to investigate

anything and everything, regardless of whether the Commission may regulate the underlying subject matter.

### POINT V

**THE COMMISSION'S AUTHORITY TO REVIEW AND APPROVE CLASS III TRIBAL GAMING ORDINANCES AND MANAGEMENT CONTRACTS DOES NOT SUPPORT THE IMPOSITION OF MANDATORY CLASS III MICS**

Defendants contend that the Chairman's duty to review and approve tribal gaming ordinances and management contracts gives the NIGC a role in regulating Class III gaming that is variously characterized as "pervasive," "substantial," "ongoing," "continuing," "active," and "active and ever-present." (Def. Br. at 19, 20, 22). The Chairman's limited approval role cannot support so grandiose a role.

A.    Tribal Gaming Ordinances.

Defendants state that "tribal gaming ordinances have statutorily required provisions that indicate congressional intent for ongoing regulation of the [Class III gaming] by the NIGC." (*Id*., at 20). To illustrate their contention that the Commission has a "continuing" regulatory role in the areas required to be in tribal gaming ordinances, Defendants point to the requirement that ordinances contain specific provisions relating to licensing, background investigations, and the duty to notify the Commission of its decision to grant a tribal gaming license. (Def. Br. at 20, 28). Defendants thus state that "background investigations and licensing are ongoing tribal gaming activities that require the Commission's continuing involvement." (*Id*.)

Defendants' argument proves too much. IGRA expressly confers on the Commission a continuing, if limited, role in connection with licensing and background investigations regardless of class. Section 2710(b)(2)(F) expressly requires that certain

licensing and background investigation information be provided to the Commission, and § 2710(c)(1) and (2) expressly give the Commission the right to consult with law enforcement officials and to require the temporary suspension of a tribal gaming license if the Commission believes a licensee does not meet appropriate licensing standards. Further, § 2706(b)(3) requires the Commission to conduct or cause to be conducted necessary background investigations, regardless of gaming classification. That authority is non-class specific, and CRIT does not contend that it does not apply to Class III licensees.

The Commission's "continuing" role in the foregoing matters does not arise from the fact that they are part of the checklist the Chairman must apply in his review of a tribal gaming ordinance. The role arises from the fact that IGRA expressly gives the Chairman and/or the Commission some further participatory role with respect to the subject – whether it be the express direction to conduct necessary background investigations, to confer with law enforcement officers, or to require a tribe to suspend a tribal gaming license if the Commission determines the licensee does not meet eligibility requirements. IGRA gives the NIGC no such role – initial or continuing – with respect to internal controls.

Defendants further argue that "continued Commission regulatory authority" is indicated by the requirement that a tribal gaming ordinance contain a provision that the tribe submit to the Commission an annual outside audit of its gaming operation. (Def. Br. at 20, 21, *citing* §§ 2710(b)(2)(C) and 2710(d)(1)(A)(ii)). CRIT agrees that the requirement that an audit be supplied to the Commission implies the authority to enforce the failure to do so. The requirement may even imply authority to "investigate" further

21

if the Commission believes the audit reveals potential violations of IGRA (although CRIT does not concede the point). The requirement does not, however, indicate a congressional intention to *confer* continuing plenary jurisdiction over all of the substantive subjects that must be included in a tribal gaming ordinance.

Nothing in IGRA or its legislative history contains even the hint that Congress intended the Chairman's ministerial authority to review an ordinance against a checklist of required provisions to confer on the Commission the authority to exercise plenary regulatory jurisdiction over the subject matter of each of those provisions. To the contrary, in those few instances in which Congress intended to give the Commission a continuing role, it expressly said so.

B.      Management Contracts.

Defendants next argue that the Chairman's more discretionary role in connection with management contracts similarly betrays congressional intent that the Commission have an "active and ever-present role . . . in Class III gaming." (Def. Br. at 22). Defendants correctly note that IGRA contemplates a more substantive role in the oversight of management contracts. Unlike the Chairman's review and approval authority over gaming ordinances, which Defendants concede is ministerial (Def. Br. at 21), the Chairman may demand additional information from tribes and prospective contractors; has broader discretion to disapprove such contracts; and may require after notice and hearing that an approved management contract be modified or voided altogether. § 2711. These are significant substantive powers. Nonetheless, the Commission's more expansive role in connection with management contracts does not support the Commission's authority to mandate Class III MICS. Indeed, the Act's

22

different treatment of Class II and Class III management contracts demonstrates the opposite.

The management contract provision, contained in § 2711, by its terms applies only to Class II gaming activity. § 2711(a) ("Subject to the approval of the Chairman, an Indian tribe may enter into a management contract for the operation and management of a Class II gaming activity . . . ."). The approval requirement is extended to Class III management contracts in § 2710(d), the section of the Act in which the substance and procedure for the regulation of Class III gaming are set out. Rather than engrafting the entirety of § 2711 on to Class III activity, § 2710(d)(9) states that the Chairman's review and approval of Class III management contracts "shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of § 2711 of this title." Thus, IGRA specifically carves out from the Chairman's Class III authority subsection (a) (the information required to be submitted to the Chairman) and subsection (e) (the enumerated grounds on which the Chairman may disapprove a management contract).[3]

Whatever the consequence of those carve-outs may be for the ultimate regulation of Class III management contracts,[4] one thing is abundantly clear: neither § 2710(d)(9) nor § 2711 gives the Chairman or the Commission the right to impose unlimited substantive regulation on management contracts. That is to say, although the Chairman

---

[3]Defendants state that subsection (e) is made applicable to Class III through subsection (f). (Def. Br. at 22). Subsection (f) concerns the modification and voiding of management contracts, not the grounds for disapproval. The Tribe is aware of no provision of law that makes the provisions of § 2711(e) applicable to Class III management contracts.

[4]The Commission has promulgated regulations governing the Chairman's review of management contracts and has made those regulations applicable to both Class II and Class III activity. 25 C.F.R. Part 533. The question of whether all of those regulations are lawfully extended to Class III gaming is neither presented in nor necessary to the decision of the instant proceeding, and the Tribe takes no position on the question.

must ensure that the contract provides, for example, "for access to the daily operations of the gaming to appropriate tribal officials," § 2711(b)(2), the Chairman may not adopt substantive regulations requiring that *specific* tribal officials have such access, or that such access must be exercised a specific number of times each day. In short, he may ensure that the rules are satisfied, but he cannot set the rules.

Even if the Commission's expansive view of its management contract review authority were correct, however, that still could not form the basis for the MICS. Yet again, the focus must be returned to what the MICS are: detailed operational standards applied to specific games and related activities. Defendants' protestations to the contrary notwithstanding, nothing in the MICS furthers the Chairman's purported need to ensure, for example, that a management contract contain an agreed ceiling for the repayment of development and construction costs (§ 2711(b)(4)), or that tribal gaming is conducted in a manner that adequately protects the environment and public health and safety (§ 2710(b)(2)(E)).

## POINT VI

### THE BROAD PURPOSES OF IGRA CONFER NO SUBSTANTIVE AUTHORITY ON THE NIGC TO IMPOSE MANDATORY CLASS III MICS

Defendants' brief leads off with eight pages identifying the statutory purposes underlying IGRA and an exegesis of how the MICS serve those purposes. This Court should not permit the narrow statutory interpretation issue to be lost in the distraction of worthy objectives or clouded by any attempt to play on fears about the gaming industry.

A.    Rejection Of The Commission's Attempt To Impose Mandatory
      Class III MICS Would Not Result In A Regulatory Void.

As it has repeatedly emphasized, the Tribe agrees that the MICS address controls that are essential to protecting the integrity of its tribal governmental gaming operation. The MICS as formulated by the NIGC are immensely helpful and, as non-binding guidance, would be welcomed by CRIT and most other tribes. (*See* Brief of *Amicus Curiae* Oneida Tribe of Wisconsin, at 17).[5]   Of course CRIT "concedes" that the MICS are integral to the policies underlying IGRA.

What CRIT does not concede, contrary to Defendants' assertion, is that the MICS "are a useful regulatory tool that is reasonably related *to the NIGC's role*" as it relates to Class III gaming. (Def. Br. at 11-12) (emphasis added).  The self-evident fact that the MICS are a useful tool is not sufficient, absent more, to confer authority on the NIGC to impose them mandatorily on Class III activity.  Under the carefully calibrated scheme of the statute, the substantive regulation of Class III gaming – including the imposition and regulation of operational standards – is left to the joint regulation of the tribes and the states pursuant to the compacting process.

---

[5] *Amicus* Oneida notes that it recently amended its compact with the State of Wisconsin to adopt the NIGC's MICS as the minimum standard for the Tribe's gaming operation. (Oneida Br. at 12-13). This voluntary adoption of the MICS, like CRIT's and Arizona's voluntary adoption of the MICS in their 2003 Compact (Pl. SJ App. Tab C, at § 3(b)(3)(B), & Tab D), is far more consistent with an oversight role over Class III gaming  than is the Commission's aggressive rule-making.  The Commission often offers helpful information and guidelines in the form of Bulletins or Interpretive Rules.  *See, e.g.*, NIGC   Bulletin 03-4, "Audit Requirements for Gaming Operations    –    Gross    Gaming    Revenue    Computation"   (available    at http://www.nigc.gov/nigc/documents/bulletins/ NIGC-03-4-jsp) (last visited Dec. 6, 2004); NIGC Bulletin 03-3, "Guidance on Classifying Games with Pre-Drawn Numbers" (available at http://www.nigc.gov/ nigc.documents/bulletins/NIGC-03-3.jsp) (last visited Dec. 6, 2004).   *And see* NIGC Interpretive Rule on Environment, Public Health and Safety, 67 Fed. Reg. 46109 (July 12, 2002) (onerous and mandatory requirement for tribal Environment, Health and Safety Plan, based on questionable statutory authority, originally proposed as formal regulation but ultimately issued as interpretive rule).

Defendants argue that "precluding the NIGC from regulating Class III gaming" would undermine Congress' intent to provide federal standards and regulations for the conduct of Indian gaming." (Def. Br. at 33, *citing* § 2701(3)). That argument rests on a basic misconception. Defendants mistake the need for *federal* regulation with the delegation of *NIGC* regulatory authority. In IGRA, federal regulation is not in all respects NIGC regulation. In order to address the findings in § 2701 and meet the purposes identified in § 2702, Congress set up a tripartite regulatory scheme. Under that scheme, it does not fall to the Commission to perform every act necessary to meet those purposes, nor does every Commission act that arguably meets those purposes come within its delegated statutory authority. Rather, Congress enacted IGRA to meet those purposes and gave the tribal, state, and federal governments their own, clearly defined, respective roles to play.

Defendants' alarmist statement that a "huge [regulatory] void" would exist without its Class III MICS is both an exaggeration and, ultimately, no answer to the proper statutory analysis. The absence of mandatorily imposed federal MICS does not translate into an absence of regulation. Tribal governmental gaming is the most regulated gaming in the country. Class III gaming is regulated by the tribes and the states, as well as "overseen" by the NIGC. CRIT's Tribal Gaming Agency, the Tribe's governmental entity responsible for regulating the Tribe's gaming activities, has over thirty employees and an annual budget of $1.2 million. In addition, the Tribe pays over $200,000 annually to the State of Arizona to defray the State's expenses incurred in performing its regulatory role under the Compact. *See* US4336-37 (2002 figures) and Pl. SJ App. Tab A (2004 figures). Even if a particular compact does not require them by name, every

tribal casino management adopts some form of internal controls as a matter of course. The mere absence of an express requirement does not mean they do not exist.

The ultimate answer, however, is that any regulatory variation or "void" is irrelevant. The varieties of regulation adopted by the tribes and states from compact to compact in an area specifically left to them for negotiation does not, by virtue of those differences, create a gap that the Commission is entitled to fill as it sees fit. To the contrary, the variation among state requirements as embodied in compact regulatory provisions was precisely what Congress had in mind when it enacted IGRA. As stated in the 1988 Senate Report:

> [T]he Committee notes that there is no adequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation of class III gaming currently in place. Thus a logical choice is to make use of existing State regulatory systems, although the adoption of State law is not tantamount to an accession to state jurisdiction. The use of State regulatory systems can be accomplished through negotiated compacts but this is not to say that tribal governments can have no role to play in regulation of class III gaming – many can and will.

*Report of the Indian Affairs Committee*, S. Rep. No. 446, 100th Cong., 2d Sess. (Aug. 3, 1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083-84.

This language makes two points abundantly clear. First, Congress recognized that the several states had their own, necessarily different, gaming regulatory systems and intended that those regulatory systems serve as models for the nascent tribal gaming industry. Thus, Congress was aware and contemplated that Class III regulatory systems would by definition vary from tribe to tribe and from state to state. Second, the foregoing language makes it clear that Congress had no intention of conferring any authority on the Commission to develop or impose any "regulatory system" on Class III gaming. The

entire legislative history, as well as the plain language and structure of the statute, manifests the congressional intent to leave the development of Class III "regulatory systems" – including internal control systems – to the negotiation and wisdom of each tribe and state in their respective compact. The Commission's adoption and enforcement of its Class III MICS intrudes on this congressional intent and exceeds the Commission's statutory authority.

B.    The Case Law Does Not Support Defendants' Heavy Reliance On Statutory Objectives.

It bears repeating that statements of policy cannot confer on an agency authority that is not granted by the substantive provisions of the legislation. *See Ethyl Corp. v. Environmental Protection Agency*, 51 F.3d 1053, 1058 (D.C. Cir. 1995); *American Mining Congress v. U. S. Army Corps of Engineers*, 951 F. Supp. 267, 277 (D.D.C. 1997) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (emphasis in original)), *aff'd*, 145 F.3d 1399 (D.C. Cir. 1998). As this Court has stated, "[c]ourts look to the general purposes of a statute in interpreting a provision only when Congress' intention is not clear. Moreover, even if the court were to look at the broad purposes of the Act, such objectives do not translate into a congressional delegation of unrestricted authority to the agencies." *American Mining Congress*, 951 F. Supp. at 277.

Defendants attempt to distinguish *American Mining* on the basis that the "legislative history . . . showed specific contrary intent to the agency's interpretation . . . ." (Def. Br. at 34). So, too, does the legislative history of IGRA. *American Mining* is squarely apposite here.

Defendants cite as "instructive" *American Trucking Ass'ns v. United States*, 344 U.S. 298 (1953), in which the Supreme Court upheld rules promulgated by the Interstate

Commerce Commission, despite the absence of a specific *in haec verba* reference in the Motor Carrier Act to the subject matter of the rules. (Def. Br. at 35). Defendants appear to argue from this premise that the NIGC has the authority to impose mandatory Class III MICS because, like the rules at issue in *American Trucking*, the MICS "were designed to confront 'evils that had grown up in the [industry].'" (Def. Br. at 35, *quoting* 344 U.S. at 311).

 *American Trucking* does not stand for the proposition that a statute's policy statement can confer authority to impose substantive regulation. The Court there upheld the ICC's gap-filling rulemaking because one reason "regulatory agencies such as the Commission are created . . . is the fond hope of their authors that they bring to their work the *expert's familiarity with industry conditions* which members of the delegating legislature cannot be expected to possess." 344 U.S. at 309-10 (emphasis added). Regulation under IGRA is not, like regulation under the Motor Carrier Act, the Securities and Exchange Act, the Federal Communications Act, or other traditional regulatory statutes, committed to the administration of a single agency to whose expertise Congress confidently delegates legislative and interpretive rule-making authority. To the contrary, the federal government's lack of expertise was one of the moving considerations behind IGRA's tripartite regulatory scheme and the controversially expanded role of the states in the compact regulation of Class III gaming. As noted above, the Senate Committee expressly declined to give the NIGC plenary regulatory authority because "the Committee notes that there is no adequate federal regulatory system in place for class III gaming . . . . Thus, a logical choice is to make use of existing State regulatory systems . . . through negotiated compacts . . . ." *Senate Committee Report* at 3083-84 (US4266). This

frank acknowledgment of the lack of federal expertise, plus IGRA's deliberate allocation of specified regulatory roles to different governmental actors, makes *American Trucking* inapposite.

C.      A Catchall Authority To Promulgate Regulations To Implement
        The Provisions Of The Act Does Not Validate The MICS As Applied
        To Class III Gaming, Even If The MICS Would Further The Purposes Of IGRA.

Defendants point to § 2706(b)(10), which authorizes the Commission to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this Chapter." Given the "express authority to develop regulations it deems necessary," Defendants contend that "the question remains whether the regulations chosen, the MICS, are reasonably related to the objectives of IGRA." (Def. Br. at 5). Once again, Defendants frame the question incorrectly. The inquiry must be instead whether "the provisions of IGRA" give the Commission substantive authority over the subject matter of the rule making. They do not.

An agency may not, under the authority of a catchall provision permitting it to promulgate implementing regulations, assume substantive authority that the statute explicitly delegates elsewhere to others. *See ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988) ("the Executive Branch is not permitted to administer [a statute] in a manner that is inconsistent with the administrative structure that Congress enacted into law"). IGRA mandates that the conditions under which a tribe may conduct Class III gaming are to be negotiated between the tribe and the state and addressed in the tribal state compacts. § 2710(d)(3)(B), (C). Those conditions include virtually all aspects of Class III gaming, including the scope of that gaming and how actual regulation of that gaming is to be apportioned between the *tribe* and the *state*. Just as the Commission

could not under the auspices of § 2706(b)(10) adopt regulations requiring tribes to submit Class III compacts for the Commission's review and approval (because that authority has been given to the Secretary of the Interior, § 2710(d)(8)), so, too, it may not by regulation impose Class III MICS, because that authority has been given to the tribes and the states under the compacting process.

Amici curiae discuss the duplicative burden imposed by the Class III MICS and how a tribe could be placed in the position of having irreconcilably conflicting obligations under its compact on the one hand and the MICS on the other.  (See NIGA Br. at 26-30; Oneida Br. at 11-13).  Defendants counter that "all of these arguments can be addressed by reference to" § 542.4(b) of the MICS which, as Defendants note, provides that internal control standards contained in a compact prevail over the MICS if "a direct conflict exists."  Defendants do not mention § 542.4(c), which provides that the MICS prevail over a "less stringent" standard contained in a compact.  The mandatory application of the more stringent standard results in exactly the improper preemption discussed by NIGA.  Nor does Defendants' other ameliorative suggestion – the existence of a cumbersome, discretionary variance procedure – cure either the problems identified by amici or the ultimate fact that the mandatory imposition of MICS on Class III gaming is contrary to law.

31

**POINT VII**

**THE LEGISLATIVE HISTORY DEMONSTRATES THAT CONGRESS
HAD A SPECIFIC INTENTION WHEN IT GAVE THE COMMISSION
OVERSIGHT RATHER THAN REGULATORY AUTHORITY
OVER CLASS III GAMING**

A.    The Legislative History Of IGRA Distinguishes
       Between "Regulation" And "Oversight."

Defendants devote considerable energy to blurring any distinction between affirmative regulation and the more modest role of oversight. (Def. Br. at 30-33). The focus here does not belong on dictionary definitions, computer citations involving unrelated statutes, or *dicta* that refer to the terms as "nearly synonymous." (*Id*. at 32-33). The focus must be on what Congress intended in 1988 when it enacted IGRA. Defendants themselves quote some but not all of the relevant language from the Senate Report, but appear blind to its clear meaning. The "Purpose" section of the Senate Report states in full:

> S. 555 provides for a system of *joint regulation by tribes and the Federal Government of **class II gaming** on Indian lands and a system of compacts between tribes and States for regulation of **class III gaming***. The bill establishes a National Indian Gaming Commission as an independent agency within the Department of the Interior. The Commission will have a ***regulatory role*** for class II gaming and ***an oversight role*** with respect to class III gaming.

*Senate Report, 1988 U.S.C.C.A.N.* at 3073 (US4256) (emphasis added). This language, not the dictionary meaning, reveals that Congress had a specific and concrete intention to create a meaningful distinction with respect to the Commission's exercise of authority over the two classes of gaming. The Commission was given only an "oversight role" with respect to Class III because the Act created a "system of compacts between tribes and States for regulation of class III gaming." The Commission's oversight role is

embodied in the clearly delineated authority to review and approve Class III gaming ordinances and management contracts, to receive annual audits, and to participate in background investigations and licensing, and, of course, to ensure that a tribal-state compact is in place before a tribe engages in Class III gaming.  Since 1997, the Commission's authority also includes the assessment of Class III fees.  In the face of both the Senate Committee's comments and the resulting different treatment of Class II and Class III activity, the Commission's oversight role cannot rationally be interpreted to include the affirmative legislation of substantive requirements governing daily operational controls.  The MICS fall within the "regulatory system" delegated to the tribes and states to govern Class III gaming, not the NIGC's limited oversight role.

B.    <u>Nothing In The Legislative History Supports The Commission's Position</u>.

The Tribe's initial brief and the briefs of *amici* NIGA and Spokane set out in compelling detail the legislative history of IGRA, and the Tribe will not duplicate the effort here.  (Pl. Init. Br. at 22-25; NIGRA Br. at 12-13; Spokane Br. at  13-15).   CRIT does note, however, that Defendants cite much of the same language from the Senate Report and contend that it supports their position.  The Tribe is confident that the Court will draw its own conclusion from what appears to be the clear and unambiguous intention of the statute's drafters.

Two other points related to Congress are worth noting.  The first is the consistent position taken before the Senate Committee on Indian Affairs by previous chairmen of the NIGC, disclaiming any authority under IGRA for the Commission to impose mandatory internal controls.  The second is the Commission's annual pilgrimage to

Capitol Hill in an attempt to persuade Congress to grant it the very authority it claims it already has. Each of these points is discussed briefly below.

1.      The Commission Historically Has Interpreted IGRA As Not Giving It The Authority To Impose Mandatory Internal Control Standards On Class III Gaming. From nearly the beginning of its existence, the Commission has bemoaned the limitations on its ability to regulate Class III activity. Its first Chairman, Anthony Hope, was blunt in his dissatisfaction. Responding to an Interior Department Inspector General's Audit Report, Chairman Hope stated:

> We agree that gaming control standards are the essence of regulation for casino-type (class III) gaming. However, *because the regulation of class III gaming was not assigned to the Commission, but was left to the tribes and the states,* gaming control standards were not imposed by the Commission. . . . We do not disagree as to the importance of control standards or regulations. However, *we must point out that the structure created by the Act assigns those responsibilities to the tribes and/or the states.*

Memorandum from Anthony J. Hope, Chairman, NIGC, to Assistant Inspector General for Audits, Department of the Interior, at 2 (Oct. 18, 1993) (emphasis added). (US3661-62) (NIGA Br., Exh. 3). *Amicus* NIGA compellingly catalogues the Commission's previous understanding and publicly stated position that IGRA neither requires internal control standards nor authorizes the NIGC to impose them on Class III activity. (NIGA Br. at 18-23).

Defendants attempt to defuse the earlier public expressions of these views in a number of ways. (Def. Br. at 39 n.4). First, they argue that the earlier views should be discounted because they constitute "isolated interpretations by individual Commissioners." (*Id.*) Ada Deer was the Assistant Secretary of the Department of

Interior for Indian Affairs, and her views were expressed as such to the Department's Inspector General. Anthony Hope was the Chairman of the Commission, and his views on the Commission's limited Class III authority were expressed to the Senate Indian Affairs Committee and to the Department of the Interior Inspector General. The sting of his assessment does not merit dismissal simply because it was not in the context of a formal rule-making subject to the Administrative Procedures Act. The Commission's formal view is what it is.

Defendants also argue that the comments at issue reflected a view "that there was a gap in IGRA that could be filled by additional legislation or by the Commission during rulemaking." (*Id.*) The latter contention is flatly belied by Chairman Hope's and the others' statements that the NIGC *does not* have the authority to impose mandatory internal control procedures through rule-making. The rest of Defendants' statement is absolutely correct: the comment reflected an absence of authority that can be remedied *only* by amendatory legislation.

Finally, citing *American Mining Congress*, Defendants argue that even where an agency changes its mind, the new interpretation is entitled to deference under *Chevron*. The full text of the language from that case, only part of which Defendants quote, puts to rest the Commission's right to deference in the circumstances present here:

> Agencies are, of course, permitted to revise their interpretations. The agencies contend that their reinterpretation is warranted in light of their increased experience. However, *courts do not defer to agency reinterpretations that exceed the scope of the agency's authority*; as with the *Chevron* doctrine generally, courts defer to agency interpretations only when the statute is ambiguous.

951 F. Supp. at 274 n.13 (citations omitted) (emphasis added).  IGRA is not ambiguous, and the NIGC's reinterpretation of its authority to impose mandatory Class III MICS exceeds its authority.  It is entitled to no deference.

        2.       <u>Congress Has Repeatedly Declined To Amend IGRA To Give The Commission The Authority To Impose Mandatory Internal Control Standards Over Class III Gaming</u>.  *Amicus* NIGA also describes the Commission's nearly annual attempts to persuade Congress to amend IGRA in order to grant the NIGC broader Class III authority, particularly as it pertains to internal control standards.  (NIGA Br. at 23-25).  As detailed in that brief, Congress has at least twelve times considered amending IGRA to give the Commission the precise authority it claims to have, and at least twelve times the Commission has walked away empty handed.  (NIGA Br. at 23).

        This Court may and should take note of the Commission's ongoing efforts to obtain an amendment of IGRA on the very issue presented in this proceeding.  Where, as here, there is no support in the plain language of a statute for the reading urged by a federal agency, the Supreme Court has ignored its general rule against construing statutes in light of legislative inaction.  Instead, the Court has considered legislative inaction "because [such unenacted legislative] proposals confirm the commonsense reading that we give [the statute] today, as well as to emphasize that nobody in the Federal Government should be surprised by this reading."  *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 16 & n.7 (2001) (citation omitted) (discussing unenacted legislative proposals to amend the Freedom of Information Act).

        In the face of Congress' inaction, the Commission has taken it upon itself to assume the very authority Congress intentionally did not give it in 1988 and has expressly

declined to grant by amendment for at least the past ten years.  The Commission must be held to the statutory boundaries of its authority unless and until Congress directs otherwise.  As this Court stated in *American Mining Congress*:

> The appropriate remedy for what the agencies now perceive to be an imperfect statute, however, is Congressional action; defendants' authority is limited to adopting regulations that effect the will of Congress as expressed in the statute.

951 F. Supp. at 278.  Until the Commission is able to persuade Congress otherwise, the Commission lacks the statutory authority to impose mandatory internal control standards – the MICS codified at 25 C.F.R. Part 542 – on Class III gaming activity.

## POINT VIII

### THE 1997 AMENDMENT OF § 2717 NEITHER CONFERRED CLASS III AUTHORITY NOR REFLECTED CONGRESSIONAL RECOGNITION THAT THE COMMISSION POSSESSES BROAD AUTHORITY OVER CLASS III ACTIVITY

The Commission ascribes great weight to the 1997 amendment, Pub. L. No. 105-83, Title I, § 123(a)(1), 111 Stat. 1566 (Nov. 14, 1997), codified at 25 U.S.C. § 2717(a) (2001), by which Congress newly authorized the Commission to assess fees on Class III operations. (Def. Br. at 23-24).  As a threshold matter, the Commission did not cite § 2717 as a statutory basis for the promulgation of the MICS in its Memorandum Decision and Order upholding its authority to adopt mandatory Class III MICS and fine CRIT for its refusal to permit the MICS audit to continue.  (US4510).

In any event, § 2717 neither confers substantive authority over Class III activity nor reflects congressional recognition of the broad authority claimed by the Commission. CRIT does not dispute that the amendment reflected Congress' belief that the Commission had *some* Class III regulatory responsibility, but CRIT sharply disagrees that

the amendment supports any broad authority by the Commission to promulgate Class III MICS.

As it does now, the Commission in 1997 had the expressly delegated authority and responsibility for reviewing Class III ordinances and Class III management contracts, and for certain other aspects of Class III gaming operations, including the review of tribal gaming licenses and enforcement actions to ensure that audits were being submitted, gaming machines were being properly classified as Class II or Class III, and compacts were in place as appropriate. CRIT does not doubt that, by 1997, 96% of the Commission's activity related in some respect to its direct or "oversight" responsibility for Class III gaming.[6] The amendment simply cannot bear the weight of the inference placed upon it by the Commission - that the amendment reflected a congressional understanding that the Commission had broad, plenary regulatory authority over Class III gaming.[7]

---

[6]According to the Commission's own figures, the number of Class III ordinances and combined Class II/Class III ordinances approved by the Commission for the years 1993 through November 1997 were: 1993 - 39; 1994 - 91; 1995 - 54; 1996 - 17; 1997 - 7. For the same period, the number of exclusively Class II ordinances approved was 1993 - 8; 1994 - 13; 1995 - 7; 1996 - 5; 1997 - 3, for a comparative total of 208 to 36. Similarly, the total number of Class II/Class III management contracts approved by the Commission went from 2 in 1993 to 8 in 1994; 9 in 1995; 2 in 1996, and 3 through November 14, 1997. Assuming that the Commission reviewed additional ordinances and management contracts that it did *not* approve, its reviewing burden was even greater than these approval figures would indicate. (The Tribe obtained these figures in 2001 from the NIGC's website and cited them in its November 9, 2001 Reply Brief to the Presiding Official. (US3420, at n.27). The NIGC website has undergone a major reorganization since this matter was first briefed in 2001, and the figures are no longer available.)

[7]The 1997 amendment cannot be read to confer a broader substantive authority over Class III activity than was expressly granted in the 1988 legislation because the amendment was passed as part of an appropriations bill. *See Department of the Interior and Related Agencies Appropriations Act, 1998*, Pub. L. No. 105-83, Title I, § 123(a)(1), 111 Stat. 1566 (Nov. 14, 1997). Courts will not infer substantive amendments effectuated through appropriations bills by implication. *Cf. Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190 (1978) ("The doctrine disfavoring repeals by implication 'applies with full vigor when . . . the subsequent legislation is an *appropriations* measure.' . . . . This is perhaps an understatement since it would be more

In short, the 1997 fee amendment neither confirmed nor granted the Commission authority to adopt Class III regulations, and no such authority exists today.

## POINT IX

### THE COMMISSION'S IMPOSITION OF MANDATORY MICS IS NOT ENTITLED TO DEFERENCE UNDER STEP II OF *CHEVRON*

Although they reach radically different conclusions, both the Tribe and Defendants believe the Court need go no further than *Chevron's* first step to determine the extent of the Commission's statutory authority. If, however, the Court disagrees and reaches Step II, the Tribe respectfully submits that the Commission's aggrandized interpretation of its own power is entitled to no deference.

Under *Chevron*, if the Court finds that Congress' intention is not clear from the language, structure, and legislative history, it must move to the next step in the analysis:

> If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 843. Even under this more deferential standard, the Commission's interpretation cannot be sustained; the Act's structure and legislative history forcefully suggest that the Commission's interpretation is *not* a permissible construction of the

---

accurate to say that the policy applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act") (emphasis in original) (quoting *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 785 (D.C. Cir. 1971)). Although *Hill* involved an alleged repeal by implication in an appropriations act, the Court's reasoning applies equally, if not more so, to the implied *grant* of additional power to an agency beyond that expressly authorized by the original, substantive legislation.

statute.  All of the arguments in Points I through VII above apply with equal force to the second phase of the *Chevron* analysis.

The Commission's previous interpretation of its Class III authority argues as well for a lack of deference.  While an agency may change its mind, it has far less latitude in doing so if the issue is its interpretation of its own statutory authority.  None of the relevant statutory language or structures has changed since the original enactment of IGRA in 1988.  What has changed is the volume and value of Class III gaming and the Commission's increased desire to insert itself into an area at odds with the statute's tripartite plan.  The Commission's ends justify the means argument is entitled to no deference.  *National Wildlife Federation v. Interstate Commerce Commission*, 850 F.2d 694, 699 n.6 (D.C. Cir. 1988) ("the *Chevron* analysis raises special concerns when the agency's interpretation of a statute serves to increase its own authority or jurisdiction; in such cases, judicial deference must not become a medium for judicial acquiescence in the agency's transgression of the limits Congress has set upon it").

Finally, if faced with a choice between an interpretation that honors tribal sovereignty and self-determination and one that results in the Commission's heavy-handed intrusion into tribal self-regulation, the Indian canon of construction strongly favors the former.  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003), *cert. denied*, 124 S.Ct. 1888, 72 U.S.L.W. 3539 (2004).  This is particularly so when restraining the Commission's hand will not result in an absence of regulation.  CRIT's tribal Gaming Code requires tribal internal controls, and the Tribe's Gaming Agency has adopted such controls.  (US3946-47, US3955, Pl. SJ App. Tab B, at 34-35).  The Compact between the

Tribe and Arizona imposes stringent internal controls, and the Arizona Department of Gaming is hyper-vigilant in monitoring the Class III gaming activities of the tribes with which the State has compacts. (Pl. SJ App. Tab D). An interpretation that inflicts intrusive and duplicative federal regulation is not in the best interests of the tribes.

In sum, the Commission's interpretation of its statutory authority is not a permissible construction of IGRA and is not entitled to deference.

## **CONCLUSION**

For all of the foregoing reasons, and for all of the reasons set forth in the Tribe's Initial Brief and the briefs of *amici curiae*, Plaintiff Colorado River Indian Tribes respectfully submits that its motion for summary judgment should be granted, and that the Defendants' cross-motion for summary judgment should be denied.

Dated: Albuquerque, New Mexico
        December 10, 2004

Respectfully submitted,

JANOV LAW OFFICES, P.C.

By:   Electronically Signed
        Gwenellen P. Janov
        Samuel D. Gollis, Of Counsel

901 Rio Grande Blvd. NW, Ste. F-144
Albuquerque, New Mexico  87104
Tel:     (505) 842-8302
Fax:     (505) 842-8309

THE SPERDUTO LAW FIRM, P.L.C.

By:    Electronically Signed
        Kim Sperduto (D.C. Bar #416127)
        Paola R. Guerrero

2021 L Street, N.W., 2nd Floor
Washington, D.C.  20036
Tel:     (202) 408-8900
Fax:     (202) 408-8910


Eric N. Shepard, Acting Attorney General
COLORADO RIVER INDIAN TRIBES
Route 1, Box 23-B
Parker, Arizona  85344
Tel:     (928) 669-1271
Fax:     (928) 669-5675

*Attorneys for Plaintiff*
*Colorado River Indian Tribes*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COLORADO RIVER INDIAN TRIBES,          )
a federally recognized Indian Tribe,          )
                                                              )
                         Plaintiff,          )
                                                              )
v.                                                          )          Case No. 1:04CV00010 (JDB)
                                                              )
NATIONAL INDIAN GAMING COMMISSION,   )
*et al.*,                                                 )
                                                              )
                         Defendants.          )
_____)

**PLAINTIFF COLORADO RIVER INDIAN TRIBES' RESPONSE TO
DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 7.1(h), Plaintiff Colorado River Indian Tribes ("CRIT" or "the

Tribe") respectfully submits this Response to Defendants' Statement of Material Facts in Support

of Cross-Motion for Summary Judgment and Response to Plaintiff's Statement of Material Facts

("Def. Resp.").

A.      **The Scope of the Record.**

The Tribe agrees with Defendants that the sole question presented for summary judgment

is whether the National Indian Gaming Commission ("NIGC" or "Commission") acted within its

statutory authority by adopting and attempting to impose on Class III gaming mandatory

Minimum Internal Control Standards ("MICS").  The Tribe does not agree with Defendants'

restrictive view of the Administrative Record.  Rather, the Tribe submits that all of the factual

material presented to the Presiding Official and comprising part of the hearing record – including

affidavits and other documents – are part of the Administrative Record and may be considered by this Court.

This matter comes to the Court as an appeal from an adjudicatory proceeding assessing a fine against the Tribe, in which the Tribe challenged the underlying legal basis of the Notice of Violation and Civil Fine Assessment.    (US3206, 3208, 3255-64).    Accordingly, the Administrative Record cannot, as Defendants state, end with the promulgation of the final regulation.   The Administrative Record includes not only the Recommended Decision of the Presiding Official and the Memorandum and Final Decisions of the Commission, but all of the material that was before and considered by the Presiding Official and the Commission.   The materials submitted in the Tribe's Summary Judgment Appendix are also properly before the Court.   They are comprised of official government documents, such as the Tribe's currently effective Gaming Code and Compact, that have superseded those that were in effect and before the Presiding Official and the Commission at the time of their decisions on the Notice of Violation and Civil Fine Assessment.   The Court may take judicial notice of those documents.

B.    **Defendants' Response to Plaintiff's Statement
Of Undisputed Material Facts.**

1.    In response to Paragraph 37 of Plaintiff's Statement, Defendants state that the "Commission was forced to reaffirm the position it originally took when it promulgated the MICS . . . because the Presiding Official exceeded her authority when she reviewed the NIGC's authority."   (Def. Resp. at 2).   The Presiding Official did not exceed her authority.   The Commission's appeal regulations require the Presiding Official to make "findings of fact and conclusions of law upon each material issue of fact or law presented on the record."   25 C.F.R. § 577.14(a).   The statutory authority on which the Commission based the Notice of Violation and

Civil Fine Assessment was a threshold material issue of law. In any event, the Chairman did not squarely raise and brief this issue before the Presiding Official or the Commission, and Defendants did not do so in their Memorandum of Law on their Cross-Motion for Summary Judgment before this Court. The question is properly before the Court. 25 U.S.C. §§ 2713(c), 2714 (2001).

**C.    Plaintiff's Response to Defendants' Statement Of Material Facts.**

1.    In Paragraph 2, Defendants cite 25 U.S.C. § 2704 for the "fact" that "[t]he NIGC was established by the IGRA to regulate Indian gaming." That section does in fact establish the NIGC, but does not say "to regulate Indian gaming." The nature and extent of the NIGC's regulatory authority is defined throughout IGRA and is the subject of this litigation.

2.    In Paragraph 4, Defendants state that the Commission's responsibilities respecting Class III gaming include "reviewing, approving, and monitoring" tribal gaming ordinances and management contracts." IGRA does not state that the Chairman or the Commission has the authority to "monitor" Class III ordinances or management contracts, and the Tribe disputes that the Chairman or the Commission has such authority.

3.    In Paragraph 9, Defendants note that the NIGC established a tribal Advisory Committee to assist the NIGC with drafting the MICS. This characterization implies that the Advisory Committee agreed with the NIGC's contention that the NIGC possesses statutory authority to impose mandatory MICS on Class III gaming. The Advisory Committee did not so agree. 64 Fed. Reg. 590-01, at 590 (Jan. 5, 1999) (US3887) and 67 Fed. Reg. at 43391 (June 27, 2002).

4.    In Paragraph 15, Defendants state that "audits are a useful tool for the NIGC and for tribal gaming regulators." The Tribe presumes that Defendants are referring specifically to

MICS audits, rather than routine financial audits.  While the Tribe agrees that MICS and MICS

compliance audits are useful tools, it disputes that the Commission has the authority to conduct

such audits to measure a tribe's compliance with mandatory Class III MICS.

5.     In Paragraph 19, Defendants state that the Tribe challenged the NIGC's authority

to "conduct an audit of a class III gaming operation."  That broad statement is incorrect.  The

Tribe challenged the NIGC's authority to conduct specifically a Class III MICS audit, on the

ground that if the Commission lacks the authority to impose mandatory MICS on the Tribe, it

necessarily lacks the authority to audit the Tribe's compliance with the unauthorized MICS.

(US3175, 3206, 3208,3255-64).

Dated: Albuquerque, New Mexico
       December 10, 2004

Respectfully submitted,

JANOV LAW OFFICES, P.C.

By:   Electronically Signed
      Gwenellen P. Janov
      Samuel D. Gollis, Of Counsel

901 Rio Grande Blvd. NW, Suite F-144
Albuquerque, New Mexico 87104
Tel:    (505) 842-8302
Fax:    (505) 842-8309


THE SPERDUTO LAW FIRM, P.L.C.

By:    Electronically Signed
       Kim Sperduto (D.C. Bar # 416127)
       Paola R. Guerrero
2021 L Street, N.W., 2nd Floor
Washington, D.C.  20036
Tel:    (202) 408-8900
Fax:    (202) 408-8910

Eric N. Shepard, Acting Attorney General
COLORADO RIVER INDIAN TRIBES
Route 1 Box 23-B
Parker, Arizona 85344
Tel:    (928) 669-1271
Fax:    (928) 669-5675

*Attorneys for Plaintiff*
*Colorado River Indian Tribes*