**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

COLORADO RIVER INDIAN TRIBES,

     Plaintiff,

       v.

NATIONAL INDIAN GAMING
COMMISSION, et al.,

     Defendants.

Civil Action No.  04-0010 (JDB)

---

**MEMORANDUM OPINION**

Plaintiff Colorado River Indian Tribes ("Colorado River" or "the tribe") is a federally-recognized Indian Tribe that operates a casino on its tribal lands in Parker, Arizona.  The casino conducts what is known as Class III gaming, which includes most conventional forms of casino gaming, such as slot machines, roulette, and blackjack.  On January 10, 2001, the tribe interrupted the National Indian Gaming Commission ("NIGC" or "Commission") as it was conducting an audit of the casino to assess the tribe's compliance with the Commission's minimum internal control standards ("MICS"), a set of detailed rules that regulate the day-to-day activities of an Indian casino.  The tribe maintained that the NIGC had exceeded its statutory powers in promulgating the MICS for Class III gaming, and that the compliance audit was therefore unlawful.  The NIGC left the premises without completing the audit.

On July 17, 2003, the NIGC issued a Final Decision and Order in which it imposed a fine of $2,000 on Colorado River for terminating the audit, and affirmed its authority under the Indian Gaming Regulatory Act ("IGRA") to issue and enforce MICS for Class III operations.  Colorado

River now brings this action against the NIGC challenging the Final Decision and Order on the ground that the NIGC is without the authority to regulate Class III gaming.  Upon a careful review of the text, the structure, and the legislative history of the IGRA, and the entire record in this case, the Court is compelled to agree with Colorado River that the statute does not confer upon the NIGC the authority to issue or enforce MICS for Class III gaming.  While surely well-intentioned, the NIGC has overstepped its bounds.  The Court therefore vacates the Final Decision and Order, and declares unlawful the MICS as applied to Class III gaming.

## BACKGROUND

Because this case involves a challenge to an agency's authority to issue regulations, the relevant background consists not only of the factual and procedural history of the case, but also a brief overview of the applicable statutes and regulations.

## I.      The Indian Gaming Regulatory Act

For centuries, the Indian tribes have occupied a unique position in American jurisprudence.  One defining aspect of the legal status of the Indian tribes has been their treatment as "domestic dependent nations" exercising "inherent sovereign authority over their members and territories."  Okla. Tax Comm'n v. Citizen Bank Potawatomi Indian Tribe of Okla., 498 U.S. 505, 509 (1991) (quotation omitted).  The sovereignty of the Indian tribes is unusual, however, in that it is subordinate to the federal government.  See Washington v. Confed. Tribes of the Colville Indian Reservation, 447 U.S. 134, 156 (1980).  The Supreme Court has consistently affirmed the authority of Congress to enact statutes that expand the role of the federal government or the States over Indian affairs at the expense of tribal sovereignty.  See United States v. Lara, 541 U.S. 193, 200 (2004); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333-34 (1983).

-2-

One traditional area of Indian sovereignty in which the federal government has begun to assert a role for itself and the States in recent years is Indian gaming.  The federal government historically had not played a direct role in the regulation of gaming activities on Indian lands.  For decades, its involvement in Indian gaming was limited to oversight activities such as the approval of tribal ordinances relating to gaming activities, the review of tribal bingo management contracts with outside authorities, and the promotion of tribal gaming enterprises through financial incentives.  See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 218-19 (1987).  The States, for their part, already had on the books statutes of general application that prohibited or regulated casino gaming, but the Indian tribes resisted the application of those laws to gaming on Indian lands.  See S. Rep. No. 100-446, at 1 (1988), reprinted at 1998 U.S.C.C.A.N. 3071.  The authority of the States to extend the reach of their general gaming regulations to Indian gaming operations was, for some time at least, an open question of law.

The Supreme Court addressed that question in its 1987 decision in Cabazon Band.  See 480 U.S. at 202.  The Court observed that the application of state gambling laws to Indian gaming had not been authorized by Congress.  The Court also noted that state regulation of Indian gaming "would impermissibly infringe on tribal government," and "[s]elf-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members" through gaming activities.  Id. at 219-21.  The Court therefore concluded that the States were without the authority to impose laws that regulate casino gaming on Indian lands.  The Court exempted from its decision those state laws that *prohibited* rather than *regulated* gambling: States that outlawed gambling in its entirety within their borders were permitted to apply those laws to Indian casinos.  See id. at 220-21.

The decision in <u>Cabazon Band</u> led to the enactment of  the Indian Gaming Regulatory Act. Pub. L. 100-497, § 2, Oct. 17, 1988, 102 Stat. 2467, <u>codified at</u> 25 U.S.C. § 2701.  Under pressure from States seeking the authority to regulate Indian gaming within their borders in the wake of the Supreme Court decision, and without gambling statutes or regulations of its own, Congress created a comprehensive scheme of regulation over Indian gaming with authority divided among the federal government, the States, and the Indian tribes.  The statute reflected a hard-won compromise among the various interests with a stake in Indian gaming:

> S. 555 is the outgrowth of several years of discussions and negotiations between gaming tribes, States, the gaming industry, the administration, and the Congress, in an attempt to formulate a system for regulating gaming on Indian lands.  In developing the legislation, the issue has been how best to preserve the right of tribes to self-government while, at the same time, to protect both the tribes and the gaming public from unscrupulous persons.  An additional objective inherent in any government regulatory scheme is to achieve a fair balancing of competitive economic interests.

S. Rep. No. 100-446, at 1.

To carry out the federal government's responsibilities in the scheme, the IGRA created the National Indian Gaming Commission ("NIGC"), an independent federal regulatory agency within the Department of the Interior.  25 U.S.C. § 2704.  The IGRA also divided Indian gaming into three classes.  Class I gaming consists of social gaming for minimal prizes and traditional forms of Indian gaming in connection with tribal ceremonies.  <u>See id.</u> § 2703(6).  Class II gaming encompasses bingo, pull-tabs, bingo-like games, and certain "non-banking" card games.  <u>See id.</u> § 2703(7)(A).  Finally, Class III gaming includes all other forms of gaming, including those ordinarily found in a casino, such as slot machines, roulette, blackjack, and other house banked games.  <u>See id.</u> § 2710(d)(1); 25 C.F.R. § 502.4.

The IGRA subjects each class of gaming to a distinct regulatory scheme.  The statute

commits the regulation of Class I gaming entirely to the Indian tribes.  See id. § 2710(a) ("Class I

gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be

subject to the provisions of this chapter.").  The statute creates a complex scheme of shared

regulation on the part of the NIGC and the Indian tribes over Class II gaming.  See id. §

2710(a)(2) ("Any class II gaming on Indian lands shall continue to be within the jurisdiction of the

Indian tribes, but shall be subject to the provisions of this chapter.").  Finally, as to Class III

gaming, the statute authorizes the States and tribes to enter into tribal-State compacts to address

regulatory issues.  See id. §2710(d)(3)(A) ("Any Indian tribe having jurisdiction over the Indian

lands upon which a class III gaming activity is being conducted, or is to be conducted, shall

request the State in which such lands are located to enter into negotiations for the purpose of

entering into a Tribal-State compact governing the conduct of gaming activities.").  The legal

question at the heart of this case is whether the IGRA also contemplates an active role for the

NIGC in the regulation of Class III gaming.

## II.    The Minimum Internal Control Standards

The dramatic growth in Indian casino gambling in the 1990s prompted the NIGC to

consider the need for a set of objective standards to ensure the integrity of gaming on Indian lands.

On January 5, 1999, following public notice and the opportunity for comment, the NIGC

promulgated regulations that set out minimum internal control standards ("MICS") for Class II

and Class III Indian gaming.  64 Fed. Reg. 590 (Jan. 5, 1999), codified at 25 C.F.R. § 542.  The

MICS regulate the day-to-day operations of an Indian casino.  They run to more than seventy

pages in the Federal Register, and touch on almost every aspect of casino gaming, including cage

and credit operations, game play and integrity, surveillance, and internal audits.

One example of the sweeping nature of the regulations can be found in the rules relating to the "coin drop" or coin bucket for gaming machines.  The MICS contain three different sets of coin drop procedures, each corresponding to a different sized facility.  See 25 C.F.R. §§ 542.21, 542.31, 542.41.  The procedures include rules relating to the number of employees who must be involved in the removal of the coin drop, e.g., id. § 542.21(g)(1), the kind of employees who must be involved in the removal of the coin drop, e.g., id. § 542.21(g)(1), (g)(3), the timing of the removal of the coin drop, e.g., id. § 542.21(g)(2), the tagging and transportation of the coin drop, e.g., id. § 542.21(g)(4), the manner in which the coin drop must be housed while in the machine, e.g., id. § 542.21(g)(5), and the purposes to which a coin drop may be put, e.g., id. § 542.21(g)(6).

The same set of minimum internal control standards are applicable to Class II and Class III gaming operations.  Each tribe is required to promulgate its own internal control standards that provide a level of control that equals or exceeds the minimum internal control standards in the regulations, and each gaming facility is also required to implement an internal control system that, at a minimum, complies with the tribal internal control standards.  See id. § 542.3(c), (d).  The regulations state explicitly that the MICS supersede less stringent gaming regulations in State-tribal contracts.  See id. § 542.4.  Finally, the regulations provide that an independent certified public accountant must verify that the casino's internal controls comply with the tribal minimum internal control standards.  See id. § 542.3(f).[1]

## III.    Gaming at Colorado River

Plaintiff Colorado River Indian Tribes ("Colorado River") is a federally-recognized Indian

---

[1]  The NIGC amended the internal control standards in 2002.  See Minimum Internal Control Standards, 67 Fed. Reg. 43390-01 (June 27, 2002).

Tribe with tribal lands in Arizona and California.  The tribe operates a Class II and Class III gaming facility at the BlueWater Resort and Casino ("BlueWater") on its tribal lands in Parker, Arizona.  Consistent with the terms of the IGRA, the tribe conducts its gaming activities at BlueWater in accordance with regulations enacted pursuant to a tribal ordinance, and rules contained in a tribal-State Class III gaming compact with the State of Arizona.  See 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands only if such activities are authorized by an ordinance or resolution that is adopted by the governing body of the Indian tribe having jurisdiction over such lands . . . and conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . .").

The tribal ordinance takes the form of a gaming code.  US 3911-3953.[2]  Section 501 of the tribal gaming code creates a body known as the Tribal Gaming Agency ("TGA"), and confers upon it civil regulatory authority over all gaming activities conducted on its tribal lands.  US 3921-22, 4333 ¶¶ 1-2.  Section 908 of the gaming code in turn requires the TGA to enact internal control standards to govern the day-to-day operations of BlueWater.  US 3946-47.  The TGA adopted a set of internal control standards in 1995, and those standards remain in effect to this day.  US 3946-47, 4333 ¶ 2.  At the time of the administrative proceedings in this case, the TGA of Colorado River employed twenty-nine individuals, virtually all of whom were tasked with regulatory activities, and received an annual budget of $1.2 million.  US 4334, ¶ 13.

The tribal-State compact between Colorado River and the State of Arizona also requires the tribe to create a set of internal control standards.  An earlier version of the Compact gave the

---

[2]  The Court will adopt the convention employed by the parties and refer to the administrative record as "US ____."  The cite in the text refers the reader to the version of the gaming code that was in effect at the time the NIGC imposed the fine at issue in this case.

TGA free rein to create the internal control standards it wishes.  US 4128-29.  However, the most recent version of the Compact provides that the standards must be at least as stringent as "the minimum internal control standards set forth in Appendix H of this Contract."  Pl.'s Mot. Summ. Judg., Ex. C at 37.  By agreement, Colorado River and the State of Arizona have adopted the federal minimum internal control standards as Appendix H of the Compact.  Id., Ex. D.  The Compact authorizes the State of Arizona to monitor and investigate the tribe's Class III gaming operation to ensure compliance with the Compact, at the tribe's expense.  The TGA has reimbursed the State roughly $250,000 per year for its expense in overseeing the tribe's Class III gaming activities.  US 4334-35.[3]

## IV.    The Contested Audit

On December 14, 2000, the NIGC advised Colorado River by letter that it intended to conduct an on-site audit of the BlueWater Casino to determine its compliance with the federal Class III MICS.  See US 3175.  The letter emphasized that the audit would be "specific to Regulation 542, Minimum Internal Control Standards."  Id.  An MICS compliance audit can extend over the course of several weeks, and includes a review by an audit team of the records for specific test dates as well as the real time observation of the tribe's procedures in all aspects of the gaming operation.  See Compl. ¶ 18; Answer ¶ 18.  The NIGC explained that the audit of the BlueWater Casino would commence on January 9, 2001, and that the NIGC would request the

---

[3]  As the numbers in the text suggest, tribal and State regulation of Indian gaming is extensive.  According to an informal survey conducted by the National Indian Gaming Association, to which three-quarters of the gaming tribes responded, those tribes dedicate $150 million each year to their own regulation of gaming.  Tribes also reimburse State regulatory agencies more than $33 million each year for the States' regulation and monitoring of Indian gaming.  By way of comparison, the IGRA places a cap of $8 million on the total amount of fees the NIGC can receive from Indian tribes each year for regulatory activities.  US 4448, ¶ 11.

opportunity to examine all gaming revenue documents from certain selected dates.  See id.  There is no indication in the record that the NIGC suspected at the time that the casino was violating any particular regulation.  US 4477.

The audit team arrived at the gaming facility on January 9, 2001.  The team examined documents on that day without incident, and returned the next day to continue an examination of the tribe's gaming documents.  On that second day, a dispute arose between the tribe and the audit team regarding the scope of the audit.  The dispute led to a series of meetings between the audit team and tribal officials, at which the officials made it known that they did not believe that the NIGC possessed the authority to examine Class III Indian gaming records.  The audit was terminated (by whom, the parties disagreed), and the NIGC departed the premises without completing the audit.  See Compl. ¶ 22; Answer ¶ 22; US 4448-50.

On January 23, 2001, the then-Chairman of the NIGC issued a Notice of Violation against Colorado River for its refusal to allow the audit team access to the full scope of the requested Class III documents and areas of the facility.  See US 3184.  The Chairman explained that Colorado River's conduct violated 25 U.S.C. § 2706(b)(4), which authorizes a representative of the NIGC to "demand access to and inspect, examine, photocopy, and audit all papers, books, and records respecting gross revenues of class II gaming conducted on Indian lands and any other matters necessary to carry out the duties of the Commission under this chapter," and 25 C.F.R. §§ 571.5, which permits the representative to enter the premises of an Indian gaming operation for the same purposes.  On May 11, 2001, the Chairman proposed a Civil Fine Assessment against Colorado River of $20,000.00.  See US 3226.

Colorado River appealed the Notice of Violation and Civil Fine Assessment through the

NIGC's administrative appeal process, and the appeal was referred to the United States

Department of the Interior Office of Hearings and Appeals ("OHA").  See US 3497.  The parties

agreed to bifurcate the appeal, so that the legal issue of the Commission's statutory authority to

adopt and enforce Class III minimum internal control standards would be decided first.  Only if it

was determined that the NIGC in fact possessed the necessary authority would the factual

questions -- whether Colorado River (rather than the NIGC) was responsible for the termination of

the audit, and whether that termination justified the proposed fine -- be considered.  See US 3355.

On May 2, 2002, a Presiding Official of the OHA issued a Recommended Decision

concluding that the NIGC lacks the statutory authority to regulate Class III gaming through

minimum internal control standards or conduct a Class III gaming audit to ensure compliance with

those standards.  US 4445-79.  The governing regulations give the parties the opportunity to file

objections with the Commission to any aspect of the recommended decision of a Presiding

Official decision.  25 C.F.R. § 577.14(b).  On May 13, 2002, the Chairman of the NIGC filed

objections with the Commission.  US 4492-96.

On May 30, 2002, the NIGC -- with one Commissioner not participating -- issued a

Memorandum Decision and Order reversing the Recommended Decision.  US 4510-19.  The

NIGC located its authority to issue the MICS for Class III gaming operations in section

2706(b)(10) of the IGRA, which states that the NIGC "shall promulgate such regulations and

guidelines as it deems appropriate to implement the provisions of this chapter."  25 U.S.C. §

2706(b)(10); US 4514-15.  The NIGC explained that its authority to conduct a Class III

compliance audit derived from section 2706(b)(4) of the statute, which gives the NIGC the power

to "audit all papers, books, and records respecting revenues of class II gaming conducted on

Indian lands and any other matters necessary to carry out the duties of the Commission under this chapter." 25 U.S.C. § 2706(b)(4); US 4516. The NIGC remanded the case to the presiding official for a hearing on the remaining factual issues in the case. US 4519.

The parties entered into a factual stipulation on remand in which they agreed to many of the relevant facts and stipulated that the fine would be reduced to $2,000. Compl., Ex. D, at 1-2. Following a hearing on October 24, 2002, the Presiding Official concluded that the tribe had interrupted the work of the NIGC audit team on the second day of the audit, and that this interference with the authorized audit was "technically" a violation of the minimum internal control standards. Compl., Ex. C, at 45. On July 17, 2003, the NIGC affirmed in a Final Decision and Order. The order found that Colorado River had "committed a violation of NIGC regulations by halting a . . . compliance audit then in progress," and reduced the fine to $2,000 consistent with the stipulation. Compl., Ex. C, at 6. The order observed that Colorado River "retains the right to seek judicial review of the Commission's decision . . . reaffirming the Commission's authority to establish MICS for Class III gaming and conduct a compliance audit." Id. at 8.

On January 7, 2004, Colorado River commenced the present action against the NIGC and its commissioners under the Administrative Procedure Act ("APA") challenging the legal basis for the Commission's Final Decision and Order. The Complaint seeks a declaration that the Final Decision and Order is in excess of the NIGC's statutory authority, an order setting aside the Final Decision and Order, and a permanent injunction preventing the NIGC from enforcing the Class III gaming minimum internal control standards against the Tribes. Compl. ¶ 1. The parties filed cross-motions for summary judgment, and the National Indian Gaming Association, the Oneida Tribe of Indians of Wisconsin, and a group of six other Indian tribes, each filed an amicus brief in

support of the position of Colorado River.  The Court held a hearing on the cross-motions for

summary judgment on April 12, 2005.

## STANDARD OF REVIEW

Under 5 U.S.C. § 706, a court reviewing the action of an agency "shall decide all relevant

questions of law, interpret constitutional and statutory provisions, and determine the meaning or

applicability of the terms of an agency action."  The reviewing court shall "hold unlawful and set

aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The court should

abide by the agency's factual findings if they are "supported by substantial evidence" and affirm

the agency's orders so long as there is a rational connection between the facts found and the choice

made.  See Midwest ISO Transmission Owners v. FERC, 373 F.3d 1361, 1368 (D.C. Cir. 2004).

The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton

Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be

searching and careful, the ultimate standard of review is a narrow one."  Id. at 416.

When a court reviews an agency's interpretation of a statute, the court turns to the two-step

analysis outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.

837 (1984).  The first step is determining whether Congress has spoken directly to the "precise

question at issue," for if it has, "the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress."  Id. at 842-43.  If, however, the statute is silent or

ambiguous on the specific issue, "the question for the court is whether the agency's answer is

based on a permissible construction of the statute."  Id. at 843 (emphasis supplied).  When the

agency's construction of a statute is challenged, its "interpretation need not be the best or most

natural one by grammatical or other standards . . . .  Rather [it] need be only reasonable to warrant

deference." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991) (citations omitted).

 The Supreme Court has stated flatly that reviewing courts "must give substantial deference

to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S.

504, 512 (1994).  When courts review an agency's construction of its own regulation, "courts owe

great deference to the interpretation adopted by the agency and will uphold that interpretation if it

is reasonable and consistent with the regulation." National Trust for Historic Preservation v.

Dole, 828 F.2d 776, 782 (D.C. Cir. 1987).  Only when an agency's interpretation of its own

regulation is "manifestly unreasonable" should the court decline to accept that interpretation.  See

Liberty Maritime Corp. v. United States, 928 F.2d 413, 419 (D.C. Cir. 1991); National Wildlife

Fed. v. Gorsuch, 693 F.2d 156, 174 (D.C. Cir. 1982).

## ANALYSIS

 Colorado River challenges the Final Decision and Order in this case on a single ground:

that the NIGC lacks the statutory authority to issue and enforce MICS for Class III Indian gaming.

To evaluate this claim, the Court turns to the familiar two-step inquiry set out in Chevron and its

progeny.

## I. The Class III MICS Do Not Survive Step One of Chevron

 As indicated, the first step of the Chevron test requires the Court to determine whether

Congress "has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842.  At this

stage of the analysis, the Court employs the "traditional tools of statutory construction, including

examination of the statute's text, structure, purpose, and legislative history." Shays v. Fed.

Election Comm'n, 414 F.3d 76, 105 (D.C. Cir. 2005) (quotation omitted).  "When Congress has

spoken, we are bound by that pronouncement and that ends this Court's inquiry." National Treasury Employees Union v. Federal Labor Relations Auth., 392 F.3d 489, 500 (D.C. Cir. 2004). Only when "Congress's intent is ambiguous" does the Court proceed to the second step of the inquiry, and consider "whether the agency's interpretation is based on a permissible construction of the statute." New York v. U.S. Envtl. Prot. Agency, 413 F.3d 3, 17 (D.C. Cir. 2005) (quotation omitted).[4]

 A careful review of the text, the structure, the legislative history and the purpose of the IGRA, as well as each of the arguments advanced by the NIGC, leads the Court to the inescapable conclusion that Congress plainly did not intend to give the NIGC the authority to issue MICS for Class III gaming.  The facts supporting this conclusion include that: (I) the IGRA does not contain language authorizing the NIGC to issue MICS for Class III gaming; (ii) by contrast, the statute contains language expressly permitting tribal-State compacts to include MICS for Class III gaming; (iii) the statute contains several provisions that are incompatible with a role for the NIGC in the regulation of Class III gaming;  (iv) the statute expressly gives the NIGC extensive regulatory authority over Class II gaming; (v) other provisions in the statute indicate that Congress did not intend to give the NIGC the power to issue MICS for Class III gaming; (vi) the structure of the statute indicates the same result; (vii) the legislative history of the IGRA states explicitly that Congress did not intend the NIGC to regulate Class III gaming; and (viii) even the NIGC itself has previously taken the position that it does not possess the authority to issue MICS for Class III

_____

 [4]  The D.C. Circuit appears to have rejected the notion that some lower level of deference is appropriate under step two of Chevron when an agency is interpreting the scope of its own authority to issue a regulation.  See Bullcreek v. Nuclear Reg. Comm'n, 359 F.3d 536, 540-41 (D.C. Cir. 2004); Okla. Natural Gas Co. v. FERC, 28 F.3d 1281, 1283 (D.C. Cir. 1994).

gaming.

All of these facts point conclusively to the same answer:  the IGRA does not authorize the NIGC to promulgate and enforce MICS for Class III gaming.  The intent of Congress to withhold this power from the NIGC is unambiguous and therefore determinative under step one of Chevron.  The only way in which the statute could be clearer on this point is if it were to state *explicitly* that the NIGC *does not* have the power to issue class III MICS.  But the mere failure of Congress to spell out on the face of a statute that an agency *lacks* a certain power cannot alone supply the ambiguity that would permit the agency to *exercise* that power under Chevron.  As the D.C. Circuit has explained:

> [T]o suggest, as the Board effectively does, that Chevron step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent.  Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.

Oil, Chem. & Atomic Workers, Int'l Union AFL-CIO v. NLRB, 46 F.3d 82, 90 (D.C. Cir. 1995) (emphasis in original).

Because the will of Congress is clear, the "inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress."  FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, (2000) (quoting Chevron, 467 U.S. at 843).  Congress may choose at any point to amend the IGRA to provide the NIGC with Class III regulatory authority, as it has considered doing on several occasions in the past.  See infra at note 13.  If the need for federal regulation of Class III gaming is as great as the NIGC claims, the Commission may be able to persuade Congress to take that step.  Until it does so, the courts must enforce the statute as

written, and intercede in any attempt to penalize an Indian tribe for violating regulations that

plainly exceed the NIGC's authority under the law.

>   **A.**    **The IGRA Does Not Contain Language Authorizing the NIGC to Issue MICS for Class III Gaming.**

The starting point for the interpretation of a statute is "the language of the statute itself."

Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985); see American Bankers Ass'n v.

National Credit Union Admin., 271 F.3d 262, 267 (D.C. Cir. 2001) ("Chevron step one analysis

begins with the statute's text."); Southern California Edison Co. v. FERC, 195 F.3d 17, 22 (D.C.

Cir. 1999) ("Of course, the starting point, and the most traditional tool of statutory construction, is

to read the text itself.").   Accordingly, the Court begins its assessment of the validity of the MICS

with the ineluctable fact that no provision in the IGRA remotely gives the NIGC the power to

regulate the day-to-day gaming activities at Class III operations.

Certainly the NIGC does not cite any such provision in its papers.   Instead, the

Commission seeks to infer a broad Class III regulatory authority from the sum of its lesser Class

III powers.   Toward this end, the NIGC cites provisions of the IGRA that give the Commission or

its Chairman the authority:   (I) to review and approve tribal gaming ordinances for Class III

operations, 25 U.S.C. § 2710(d)(2); (ii) to review and approve management contracts with outside

companies for the operation of Class III operations, id. §§ 2710(d)(9), 2711(b); (iii) to review and

approve Tribal-State compacts authorizing Class III gaming, id. §§ 2710(d)(5); (iv) to review the

results of the background investigations conducted by a Class III operation, consult with law

enforcement officials concerning licenses, and object to the issuance of a license if necessary, id.

§§ 2710(b)(2)(F), 2710(c)(1); (v) to conduct its own background investigations of individuals in

Class III facilities, id. § 2706(b)(3); and (vi) to assess fees on operations that engage in Class III

gaming activity, id. § 2717(a).[5]

These are important oversight responsibilities, but none approaches the sweeping authority the NIGC claims to regulate Class III gaming. The Commission focuses most of its attention on its power to approve and review tribal gaming ordinances and management contracts for Class III facilities. The statute gives the Chairman of the Commission the authority to approve these documents once he determines that certain conditions set out in the statute have been met. Id. §§ 2710(d)(2), 2710(d)(9), 2711(b). Most of the conditions relate to language that must appear in the ordinance or contract -- one example is the requirement that a management contract include a clause guaranteeing tribal gaming officials daily access to the gaming facility. See id. § 2711(b)(2). The NIGC contends that its authority to ensure the *presence* of these terms in an ordinance or contract implies the authority to monitor the casino on an ongoing basis to ensure *adherence* to the terms of the ordinance or contract. Def. Mem. Supp. Cross-Mot. Summ. Judg. ("NIGC Mem.") at 19-23.[6] There is, of course, a clear distinction between the power to approve the terms of an ordinance or contract and the power to police compliance with the terms of a ordinance or contract, and there is reason to believe that Congress did not intend to give the NIGC the latter power for Class III gaming.[7]

─────────────────

[5] Several of the NIGC's powers are alloted to the Chairman of the Commission, while others are given to the Commission itself. For purposes of this particular discussion, it is fair to treat all of these powers as vested in the NIGC.

[6] As the NIGC describes its theory, "the Chairman's authority to approve ordinances and management contracts includes the power to enforce their provisions." Id. at 19.

[7] For one thing, the text of the statute only empowers the NIGC to monitor Class II gaming. The statute authorizes the NIGC to "monitor Class II gaming conducted on Indian lands on a continuing basis," without giving the NIGC a similar authority as to Class III gaming. Id. § 2706. Elsewhere, the statute goes out of its way to deny the NIGC a monitoring role as to Class

Even supposing, however, that the NIGC's power to review and approve a tribal ordinance or management contract implies a tacit power to monitor ongoing compliance with the *existing* terms of the ordinance or contract, the Commission cannot explain how that tacit power in turn would require the creation of hundreds of pages of *new* internal operating requirements regulating the day-to-day conduct of Class III facilities.  The NIGC could understandably need the power to audit a Class III operation to execute any monitoring role it has over Class III gaming, and the statute might fairly be read to give the NIGC this power.  See 25 U.S.C. § 2706(b)(4) (NIGC may "audit all papers, books, and records respecting  . . . any . . . matters necessary to carry out the duties of the Commission under this chapter").  But to start with the statutory authority to approve a contract or ordinance and infer from it a power to monitor, and then to take that authority and infer from it the unqualified power to regulate, is to abandon even the pretense of limiting an agency's powers to those authorized by Congress.  See Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

So, to return to an example used earlier, although the Chairman of the NIGC is authorized to ensure that a management contract provides "for access to the daily operations of the gaming to

---

III tribal ordinances and management contracts.  For instance, as to Class II gaming, the statute prohibits the NIGC from approving a management contract -- and permits it to void an existing contract -- in one of three scenarios:  (I) if certain language does not appear in the contract, id. § 2711(b), (ii) if the management fee is unreasonable, id. § 2711(c), or (iii) if certain other circumstances exist (for example, if a management official "has been or subsequently is convicted of any felony or gaming offense," or the management contractor "has deliberately or substantially failed to comply with the terms of the management contract"), id. § 2711(e).  This final set of conditions, unique among the conditions, entails an ongoing monitoring role for the Commission. It is notable, then, that the statute excludes this final set of conditions from the catalog of conditions the Commission must assess in considering Class III management contracts.  See id. § 2710(d)(9).

appropriate tribal officials," id. § 2711(b)(2), and might possess the ancillary power to monitor the

facility to ensure that the contractor in fact gives tribal officials such access, neither of these

powers can fairly be read to permit the Commission to create its own rules regarding the number

of officials who must have access to the facility, or how frequently they must be allowed access.

And whatever else is true, the Commission doubtless cannot use its approval powers as a platform

to issue dozens of pages of binding regulations on other topics bearing no relation to access to a

gaming operation or any of the other statutory conditions for approval of a tribal ordinance or

management contract.  To reach any other conclusion would give the agency a virtually free-

floating regulatory authority, unanchored to the plain language of the governing statute.[8]

### B.    By Contrast, the Text of the IGRA Expressly Authorizes Tribal-State Compacts to Contain MICS for Class III Gaming.

The absence of language in the IGRA empowering the NIGC to issue minimum internal

control standards for Class III gaming contrasts starkly with the language in the statute that

expressly permits tribal-State compacts to contain such standards.  Section 2710(d)(3)(A) of the

statute requires a Tribe wishing to conduct Class III gaming activities to enter into negotiations

with a State for purposes of entering into a tribal-State compact.  Section 2710(d)(3)(C) of the

statute provides that the tribal-State compact may include provisions relating to:

---

[8]  The NIGC makes the related argument that its statutory authority to audit Class III gaming, considered alongside its authority to issue civil fines and even close noncompliant Class III operations, is itself evidence of a congressional intent to provide the Commission with an active Class III regulatory role.  NIGC Mem. at 23-24; 25 U.S.C. §§ 2706(b)(4), 2713(a)(1) & (b)(1).  The simple answer to this argument is that the power to investigate and enforce does not also imply the authority to create new rules for the agency to investigate and enforce.  The IGRA gives the NIGC an oversight role as to Class III gaming in several narrow areas, many of them listed in the text.  The Commission may use its investigative and enforcement powers in furtherance of this oversight role.  There is no evidence, however, that Congress intended the presence of these powers to signify a limitless regulatory authority over Class III gaming.

> (I) . . . laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity; . . . (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing . . . .; (vii) any other subjects that are directly related to the operation of gaming activities.

Id. § 2710(d)(3)(C).

The understanding that tribal-State compacts will contain "regulations and "standards for the operation" and "maintenance" of Class III gaming facilities is echoed elsewhere in the statute. In particular, section 2710(d)(3)(A) of the statute states that the tribal-State compact will "govern[] the conduct of gaming activities" for tribes conducting Class III gaming activity.  See id. § 2710(d)(3)(A); see also id. § 2710(d)(3)(B) (tribal-State compact will "govern[] gaming activities" of Class III facilities).  These provisions confirm that Congress understood that it would be the Tribes and the States, not the federal government, who would be responsible for the regulation of Class III Indian gaming.

**C.    The Statute Contains Several Provisions At Odds With a Role for the NIGC in the Regulation of Class III Gaming.**

The IGRA not only lacks language giving the NIGC a role in the regulation of Class III gaming, but it contains several provisions that are inconsistent with such a role.  One such provision is section 2710(d)(5), which states:

> Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gambling on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the state laws and regulations that are made applicable by any Tribal-State compact . . . .

25 U.S.C. § 2710(d)(5).  The "subsection" to which section 2710(d)(5) refers is section 2710(d), which contains most of the provisions in the statute relating to Class III operations.  Several of these provisions were discussed in the preceding section of this opinion; the NIGC relies heavily

on section 2710(d) as the basis for its argument that it has the authority to regulate Class III

gaming.  However, section 2710(d)(5) establishes that none of the rules in section 2710(d) should

be read to authorize the federal government to supersede an Indian tribe's regulation of its own

Class III gaming activities.  The federal MICS do precisely that.[9]

    In fact, while section 2710(d)(5) anticipates that there will be "state laws or regulations"

that "regulate class III gambling," and permits those laws or regulations to supersede Indian

regulation of class III gambling through the mechanism of a tribal-State Compact, the provision

does not appear to contemplate that there will be federal laws or regulations relating to the

regulation of Class III gaming at all.  Several other sections fit the same mold.  For example,

section 2710(d)(1) of the statute states that

> Class III gaming activities shall be lawful on Indian lands only if such activities are
> -- . . . (C) conducted in conformance with a Tribal-State compact entered into by
> the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1).  Once again, this provision views a tribal-State compact as the lone

source for Class III gaming regulations.  There is no similar provision requiring Class III gaming

activities to be conducted in accordance with federal regulations.  See also id. § 2710(c)(5)(B)

(providing that Class III gaming activity "shall be fully subject to the terms and conditions of the

Tribal-State compact," but making no mention of federal regulation).

    One final provision bears attention for its incompatibility with a broad NIGC regulatory

power over Class III gaming.  When a State and a tribe cannot agree on a tribal-State compact, and

_____

[9] Section 542.3 of the MICS requires the tribe to create a set of internal control standards
that "[p]rovide a level of control that equals or exceeds those set forth in this part," and section
542.4 of the MICS provides that the MICS supersede any less restrictive internal control standards
in a Tribal-State compact.  25 C.F.R. §§ 542.3, 542.4.

an attempt at mediation is unsuccessful, the statute provides that the Secretary of the Interior can step in to "prescribe . . . procedures . . . under which Class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(vii).  This is the only provision in the statute that identifies a scenario in which the federal government can set the operating standards for Class III gaming.  The fact that the statute allows the federal government to assume that role only in a limited circumstance not present here, and even then gives the authority to the Secretary of the Interior rather than the NIGC, once again indicates that Congress did not intend to give the NIGC broad authority to regulate class III gaming.

**D.      The Statute Gives the NIGC Extensive Regulatory Authority over Class II Gaming.**

The absence of language in the IGRA authorizing the NIGC to regulate Class III gaming also contrasts starkly with language in the statute that expressly contemplates a role for the federal government in the regulation of Class II gaming.  Section 2706(b)(1) of the IGRA states that "[t]he Commission . . . shall monitor class II gaming conducted on Indian lands on a continuing basis." 25 U.S.C. § 2706(b)(1).  There is no comparable provision for Class III gaming.  Section 2706(b)(2) of the statute further provides that "[t]he Commission . . . shall inspect and examine all premises located on Indian lands on which class II gaming is conducted."  Once again, there is no similar grant of authority for Class III gaming.  The Court need not conclude here that these powers permit the NIGC to issue MICS for Class II gaming.  It suffices to note that the statute contemplates a far more aggressive role for the Commission in the realm of Class II than in Class III gaming.

**E.      Other Provisions of the IGRA Support the Conclusion that the NIGC Lacks a Regulatory Role Over Class III Gaming.**

Two other provisions in the statute lend further support to the conclusion that the NIGC lacks the power to regulate Class III gaming. First, the statute contains a provision allowing an Indian tribe operating a Class II gaming operation to petition the NIGC for a "certificate of self-regulation." 25 U.S.C. § 2710(c)(3). A tribe that receives a certificate of self-regulation is not subject to the provisions of the statute authorizing the Commission to audit and perform background investigations of the employees of Indian gaming operations, or to monitor and inspect the premises of Class II gaming operations. See id. § 2710(c)(5). Once again, there is no similar provision for Class III gaming. The NIGC speculates that there are no certificates of self-regulation for Class III gaming because that class of gaming is "complex," but it is unable to offer a single piece of evidence that this is the reason. See NIGC Mem. at 25. The far more plausible explanation for why the statute does not permit a tribe to obtain an exemption from federal regulation of Class III gaming is that the statute does not contemplate federal regulation of Class III gaming to begin with.

Second, as indicated, the statute requires the negotiation of a tribal-State compact that will contain rules "governing gaming activities" in class III facilities. See 25 U.S.C. § 2710(d)(3)(B), (C). However, the statute does not locate the power to approve a tribal-State compact with the NIGC or its Chairman -- who are given most of the other regulatory and oversight duties under the Act -- but rather with the Secretary of the Interior. See, e.g., id. § 2710(d)(8)(A) ("The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe."). The statute also vests with the Secretary of the Interior the power to issue regulations of Class III gaming if the tribe and the State cannot agree on a compact. See id. § 2710(d)(8)(C). By placing the task of overseeing

-23-

tribal-State Compacts in the Secretary rather than the NIGC, the statute distances the NIGC from the regulation of Class III gaming, and provides another indication that Congress viewed the regulation of that class of gaming as beyond the purview of the NIGC.

     **F.    The Structure of the IGRA Confirms that the NIGC Lacks a Regulatory Role Over Class III Gaming.**

The desire of Congress to deny the NIGC the authority to regulate Class III gaming is reflected in the structure of the statute.  The IGRA establishes a three-part framework for the regulation of Indian gaming.  First, section 2710(a)(1) provides that Class I gaming on Indian lands "is within the exclusive jurisdiction of the Indian tribes."  25 U.S.C. § 2710(a)(1).  Second, section 2710(a)(2) states that Class II gaming on Indian lands "shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter," id. § 2710(a)(2), and section 2710(b) goes on to describe the rules for the shared "regulation of class II gaming activity" between the Indian tribes and the federal government, id. § 2710(b).  Finally, section 2710(d) outlines a framework for the regulation of Class III gaming, explaining that the rules "governing the conduct of gaming activities" will be placed in a compact negotiated between the State and a Tribe.  Id. § 2710(d).

In this manner, section 2710 embodies the three components of the IGRA regulatory scheme.  The regulation of Class I gaming is assigned to the Indian tribes; the regulation of Class II gaming is vested jointly in the federal government and the Indian tribes; and the regulation of Class III gaming is located in negotiated compacts between the States and the Indian tribes.  The NIGC's effort to impose broad regulations on the operations of Class III gaming is flatly inconsistent with this scheme.  See Artichoke Joe's California Grand Casino v. Norton, 353 F.3d 712, 726 (9th Cir. 2003) (explaining that Congress "devised the Tribal-State compacting process

as a means to resolve the most contentiously debated issue in the legislation: which authority --

Tribal, State, or Federal -- would regulate class III gaming"); Rhode Island v. Narragansett Indian

Tribe, 19 F.3d 685, 690 (1st Cir. 1994) ("[T]he tribal-state compact is the exclusive method of

regulating class III gaming.").

   Of course, too heavy a focus on the structure of a statute can obscure its details.  For

instance, notwithstanding the framework of the IGRA, the statute gives the federal government a

considerable *oversight* role in Class III gaming.  A review of the structure of the statute is useful

in this case, however, in that it reveals the extent to which allowing the NIGC the plenary power

to regulate the conduct of Class III gaming would conflate the essential difference between Class

II and Class III gaming.  The division of responsibility among the tribes, the States, and the federal

government across the different classes of gaming is the backbone of the IGRA and reflects a

compromise achieved only after years of negotiations.  See supra at 4; infra at 27.  There is no

indication that Congress intended to give the NIGC the opportunity to rework so dramatically the

bargain reflected in the basic structure of the statute.

   **G.    The Legislative History of the IGRA States Explicitly that Congress Did Not
           Intend the NIGC to Regulate Class III Gaming.**

   The statutory language and the structure of the IGRA are clear, and so resort to the

legislative history of the statute is unnecessary.  See Claybrook v. Slater, 111 F.3d 904, 907 (D.C.

Cir. 1997) ("If statutory language is clear . . . it is both unnecessary and inappropriate to track

legislative history."); Int'l Union, United Mine Workers of Am. v. Mine Safety and Health

Admin., 900 F.2d 384, 386 (D.C. Cir. 1990) ("Where the congressional intent is clear, resort to

legislative history to aid construction is unnecessary.").  Were any doubt to remain as to the intent

of Congress, however, the legislative history of the IGRA demonstrates conclusively that

Congress sought to deny the NIGC the power to regulate Class III gaming.

The Senate Report accompanying the bill that was enacted as the IGRA "is replete with explanations of the respective roles played by the tribes, federal government, and state government in regulating Indian gaming." United States v. Sisseton-Wahpeton Sioux Tribe, 897 F.2d 358, 365 (8th Cir. 1990). The report was written by the Select Committee on Indian Affairs ("the Committee"), and states definitively that the IGRA commits the regulation of Class III gaming to tribal-State compacts, not to the federal government. See S. Rep. No. 100-446. The report makes that much clear on the very first page, in a section titled "Purpose." That section reads in its entirety:

> S. 555 provides for a system for joint regulation by tribes and the Federal Government of class II gaming on Indian lands and a system for compacts between tribes and States for regulation of class III gaming. The bill establishes a National Indian Gaming Commission as an independent agency within the Department of the Interior. The Commission will have a regulatory role for class II gaming and an oversight role with respect to class III.

Id. at 1.

That passage of the Senate Report could not be any clearer that Congress did not intend the NIGC to assume a role in the day-to-day regulation of Class III gaming. The report repeats this point several times in the ensuing pages, emphasizing that the NIGC would "exercise regulatory authority" over Class II gaming, but only an "oversight" role over Class III gaming. Id. at 9 ("Sub-paragraph 4(8)(B) specifically excludes from Class II, and thus from regulation by a tribe and the National Indian Gaming Commission, so-called banking card games and slot machines."); id. at 11 ("Under the bill the Commission's princip[al] responsibilities are with Class II gaming and it will participate only minimally in the regulation of class III gaming."); id. at 21 ("The bill defines three classes of Indian gaming, giving the commission regulatory authority over class II gaming

and the states, with commission oversight, authority to regulate class III gaming.").

The report provides an explanation of why Congress chose not to assign the NIGC the

power to regulate Class III gaming:

> The Commission notes that there is no adequate federal regulatory system in place
> for Class III gaming, nor do tribes have such systems for the regulation of Class III
> gaming currently in place.  Thus a logical choice is to make use of existing state
> regulatory systems, although the adoption of state law is not tantamount to an
> accession to state jurisdiction.

Id. at 14.  Therefore, the report explains, the "Committee's intent in this instance is to

acknowledge the important difference in regulation that such games and machines require and to

acknowledge that a tribal-state compact for regulation of such games is preferable to Commission

regulation."  Id. at 9; see also id. at 13 ("After lengthy hearings, negotiations and discussions, the

Committee concluded that the use of compacts between tribes and states is the best mechanism to

assure that the interests of both sovereign entities are met with respect to the regulation of

complex gaming enterprises such as . . . casino gaming.").

Defendants struggle to avoid this clear evidence of legislative intent.  They once

again quote language from the floor debates of the bill stating that Class III gaming is "complex,"

NIGC Mem. at 40-41, but they are unable to quote any language to the effect that the framers

believed the federal government was the sovereign best suited to address this complexity.  In fact,

as indicated, the Senate Report concluded that tribal-State compacts were the best available

option, due in large part to the fact that States had in place "existing state regulatory systems" and

a far greater familiarity with the regulation of casino gaming than did the federal government.  S.

Rep. No. 100-446, at 13-14.

The NIGC also cites portions of the legislative history for the proposition that a State

could choose not to regulate tribal gaming. NIGC Mem. at 41. However, the portions cited by

the NIGC all are discussing the possibility that a State could conclude that a Tribe has the capacity

to regulate itself, and that it would be in the best interest of the Tribe to do so. The legislative

history appears to regard that sort of tribal self-rule as a *positive* development. See, e.g., 134

Cong. Rec. at S12651 (daily ed. Sept. 15, 1988) ("Some tribes can assume more responsibility

than others and it is entirely conceivable that a state may want to defer to a tribal regulatory

system and maintain only an oversight one."); S. Rep. No. 100-446, at 14 ("The use of state

regulatory systems can be accomplished through negotiated compacts but this is not to say that

tribal governments can have no role to play in regulation of class III gaming -- many can and

will."). An increased tribal role through state deferral is inconsistent with the federal regulation of

Class III gaming that the NIGC urges. At the very least, then, the legislative history does not

suggest at any point that the possibility of non-involvement by certain States necessitates giving

the NIGC the power to implement a comprehensive scheme of federal gaming regulations.

Finally, while acknowledging that the legislative history describes its role over Class III

gaming as one of "oversight" rather than "regulation," the NIGC contends that the Class III MICS

qualify as "oversight." Def. Mem. at 32. NIGC suggests that it would be engaging in "regulation"

of Class III gaming only if its officials took a position on the floor of a Class III casino, policing

the activity of the casino on a daily basis. Tr. of Mot. Hearing, Apr. 12, 2005, at 34. This is

neither the common nor dictionary meaning of "regulation," and there is no indication whatsoever

that it is the intended meaning of the word in the Senate Report.[10] In fact, since the NIGC does

---

[10] See Webster's Third International Dictionary 1913 (1993) (defining "regulation" as "an authoritative rule or principle dealing with details of procedure," and "regulate" as "to govern or direct according to rule" or "to bring under the control of law or constituted authority").

not submit any evidence that Congress intended the *NIGC* to police *Class II* gaming daily on the casino floor, or the *States* to police *Class III* gaming daily on the casino floor, the NIGC's argument makes hash of the repeated statements in the legislative history assigning a "regulatory" role to the Commission for Class II gaming and to the States and Tribes for Class III gaming.  The NIGC's strained arguments cannot obscure the clear and simple message of the legislative history of the IGRA:  Congress did not intend to give the NIGC the power to regulate Class III gaming.

### H.    The Prior Position of the NIGC Was that it Lacked the Authority to Issue MICS for Class III Gaming.

In the several years following the enactment of the IGRA, even the NIGC took the official position that it lacked the authority to regulate Class III gaming.  On October 18, 1993, the first Chairman of the NIGC responded to a request of the Department of the Interior for comments on an audit report relating to the implementation of the IGRA.  He wrote:

> We agree that gaming control standards are the essence of regulation for casino-type (class III) gaming.  However, because the regulation of class III gaming was not assigned to the Commission but was left to the tribes and the states, gaming control standards were not imposed by the Commission. . . .  We do not disagree as to the importance of control standards or regulations.  However, we must point out that the structure created by the Act assigns those responsibilities to the tribes and/or the states.

Amicus Br. of National Indian Gaming Association ("NIGA"), Ex. C (Memo. from Anthony J. Hope to Assistant Inspector General for Audits, Dep't of the Interior, Oct. 18, 1993), at 2.[11]  The

---

[11]  The Assistant Secretary of the Interior for Indian Affairs expressed the same view in his comments on the audit report:

> We agree that gaming industry standards relating to regulatory and operation requirements to enhance the integrity of the gaming was not included as part of the IGRA.  We find this to be consistent with the national policy toward gambling at the time of the IGRA's consideration. . . .  Because of the diversity [among the states' gambling policies], we believe Congress did not see the Federal Government,

Chairman repeated this position in testimony to Congress the following year, explaining:

> When the IGRA was passed, it was thought that allowable Class III gaming would only include that gaming that that state authorized others to engage in, and that existing state regulatory mechanisms could be modified or expanded to absorb the additional responsibility. Therefore, the Congress did not foresee the need to impose broad federal requirements for the regulation of class III gaming. . . . [The Commission's] limited responsibilities [over class III gaming] are not an adequate system of operational regulation. For example, there is no central licensing authority. Standards and controls are all subject to negotiation. There are no minimum standards or rules for class III gaming.

Amicus Br. of NIGA, Ex. E (Testimony of Anthony J. Hope before Senate Committee on Indian Affairs, Apr. 20, 1994), at 3.[12]

The case law sends mixed signals on the weight the Court should give such prior memoranda and testimony. On the one hand, the Supreme Court has emphasized that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." Immigration and Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987) (quotation omitted). On the other hand, the Court has held that "[i]nterpretations such as those in

---

> which was further removed from the people than their state governments, substituting its judgment for that of the states in this area. Congress saw no public interest in preempting this authority by the imposition of federal standards.

Amicus Br. of National Indian Gaming Association, Ex. D (Memo. from Ada E. Deer to Assistant Inspector General for Audits, Dep't of the Interior, Oct. 18, 1993, at 24).

[12] This position even seems to have made its way into the Commission's early regulations. In 1993, the Commission issued a regulation stating that "[n]othing in the Indian Gaming Regulatory Act or this Chapter shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with a State. . . ." 25 C.F.R. § 501.2. This regulation is inconsistent with the eventual promulgation of the MICS, which provide that "[i]f an internal control standard or a requirement set forth in this part provides a level of control that exceeds the level of control under an internal control standard established in a Tribal-State compact, then the internal control standard or requirement set forth in this part shall prevail." Id. § 542.4(c).

opinion letters -- like interpretations contained in policy statements, agency manuals, and

enforcement guidelines, all of which lack the force of law -- do not warrant <u>Chevron</u>-style

deference."  <u>Christensen v. Harris County</u>, 529 U.S. 576, 586 (2000).

   The issue here, though, is not whether a particular agency opinion is due deference under

<u>Chevron</u> step two, but whether the earlier opinion has any bearing on the interpretation of the

statute in the first instance under <u>Chevron</u> step one.  And on that issue, it would blink reality to

ignore the fact that even the defendant agency tasked with implementing the statute had earlier

taken the view that it lacked the authority to issue the regulations in question.  <u>See</u>, <u>e.g.</u>,

<u>Pennsylvania Medical Soc. v. Snider</u>, 29 F.3d 886, 895 (3d Cir. 1994) (holding that "the statutory

language, context and legislative history demonstrate that Congress has spoken on the issue" in a

manner averse to the defendant agency under <u>Chevron</u> step one, and emphasizing that even the

agency had previously shared that view of the statute in a policy statement).[13]

---

   [13]  Amici submit evidence that later Congresses also took the view that the NIGC does not
authorize Class III MICS.  Since the enactment of the IGRA, they note, Congress has considered
and declined to enact at least twelve different bills that would amend the IGRA to give the NIGC
the power to promulgate Class III MICS.  <u>See</u> S. 2232, 108th Cong. (2004); H.R. 3745, 108th
Cong. (2004); S. 1529, 108th Cong. (2003); S. 832, 107th Cong. (2001); H.R. 2214, 107th Cong.
(2001); S. 2920, 106th Cong. (2000); S. 339, 106th Cong. (1999); S. 399, 106th Cong. (1999); S.
1870, 105th Cong. (1998); S. 1077, 105th Cong. (1997); S. 487, 104th Cong. (1995); S. 2230,
104th Cong. (1994).  The utility of this evidence is questionable.  The Supreme Court has
cautioned that "[n]on-action by Congress is not often a useful guide" of legislative intent, <u>Bob
Jones Univ. v. United States</u>, 461 U.S. 574, 600 (1983), although it has also indulged this
evidence on occasion, <u>see</u> <u>Dep't of Interior v. Klamath</u>, 532 U.S. 1, 16 n.7 (2001).

   This case may illustrate one of the hazards of relying on post-enactment legislative history.
The task of the court is to interpret the intent of the Congress that enacted the statute on the books.
When a later Congress takes up consideration of a different bill empowering (for example) an
agency to act, it may indicate that later Congress's view that an earlier statute does not provide the
power, but it is also possible that the later Congress wants to clarify its view that the earlier statute
does provide that power in the face of controversy on that point.  And in fact, there is at least
some indication that this was Congress's view on at least one of the occasions on which it

I.      **Statutory Purpose and the Application of the Indian Canon of Statutory Interpretation**

Faced with this clear evidence of the intent of Congress reflected in the text, structure, and legislative history of the IGRA, and the fact that the NIGC had earlier interpreted the statute to deny it the authority it now seeks, the NIGC turns to two legal arguments.  First, the Commission urges that the minimum internal control standards are reasonably related to the purposes of the IGRA.  Second, the Commission contends that the Indian canons of statutory interpretation counsel in favor of its interpretation of its powers.  Because neither the asserted purpose of the statute nor the Indian canons of statutory interpretation can overcome the clear intent of Congress, the Court rejects each of these arguments.

1.      <u>Mourning</u> **and the Purpose of the IGRA**

The Commission argues that this Court should uphold the MICS because they are reasonably related to the statutory purposes of the IGRA, which are described in the statute as

---

contemplated amending the IGRA to explicitly authorize Class III MICS.  The Senate Report on a 2000 bill explained that:

> The NIGC, in April of 1999, promulgated regulations which established regulatory standards to which all Indian tribal gaming operations must adhere.  However, NIGC and individual tribes have questioned the NIGC's authority to promulgate and enforce these regulations.  It is the Committee's intention to clarity its position on the authority of the NIGC to promulgate minimum internal control standards by specifically authorizing the NIGC to promulgate and enforce those regulations, within the jurisdictional framework established by IGRA.

S. Rep. No. 106-498, 106th Cong., 2d Sess., at 6 (2000).  Whatever weight should be placed on legislative non-action in the run of cases, the Court doubts its usefulness when the legislative history contains statements like this (and there is no other basis for looking to post-enactment evidence of legislative intent, such as legislative acquiescence in a regulatory position).  Therefore, the Court notes, but does not rely on, this evidence of post-enactment legislative history.

including "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation" and

"assur[ing] that gaming is conducted fairly and honestly by both the operator and players."  25

U.S.C. § 2702(2).  In support of this argument, the Commission cites section 2706(b)(10) of the

statute, which gives it the authority to "promulgate such regulations and guidelines as it deems

appropriate to implement the provisions of this chapter," and the Supreme Court's statement in

Mourning v. Family Publ. Servs., Inc., 411 U.S. 356, 365 (1973) (quotation omitted), that where

"the empowering provision of a statute states simply that the agency may 'make . . . such rules and

regulations as may be necessary to carry out the provisions of this Act,' we have held that the

validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related

to the purposes of the enabling legislation."

     The notion that a court is free to interpret a statute to conform to some view of its general

purposes, even if the resulting interpretation is at odds with the statute's clear language, structure,

and legislative history, has long since been rejected.  As the Supreme Court has explained:

> Application of "broad purposes" of legislation at the expense of specific provisions
> ignores the complexity of the legislative problems Congress is called upon to
> address and the dynamics of legislative action.  Congress may be unanimous in its
> intent to stamp out some vague social or economic evil; however, because its
> Members may differ sharply on the means for effectuating that intent, the final
> language of the legislation may reflect hard-fought compromises.  Invocation of the
> "plain purpose" of legislation at the expense of the terms of the statute itself takes
> no account of the processes of compromise and, in the end, prevents the
> effectuation of congressional intent.

Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373-74 (1986).

The law is therefore clear that courts and agencies "are bound, not only by the ultimate purposes

Congress has selected but by the means it has deemed appropriate, and prescribed, for the pursuit

of those purposes."  MCI Telecomm. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 231 n.4 (1994);

see also Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 220 (2002) ("vague

notions of a statute's basic purpose are . . . inadequate to overcome the words of its text regarding

the specific issue under consideration" (quotation and emphasis omitted)); Orca Bay Seafoods v.

Northwest Truck Sales, Inc., 32 F.3d 433, 436 (9th Cir. 1994) ("We would be writing a different

statute, not just construing it, by treating the words as having no meaning and looking instead to

the values underlying the language to be construed so that we can create law effectuating those

values.").[14]

Thus, although Mourning stated that a broad grant of rule-making authority allows an

agency to issue regulations that are "reasonably related to the purposes of the enabling

legislation," courts have consistently read this language to describe a heightened level of

deference that is due the agency's interpretation of an ambiguous statute under Chevron step two,

rather than a warrant to override a clear statute under Chevron step one.  See Am. Fed'n of Labor

& Cong. of Indus. Orgs. v. Chao, 409 F.3d 377, 384 (D.C. Cir. 2005) (noting, in discussion of

Mourning, that "[e]ven when Congress has stated that the agency may do what is 'necessary,'

whatever ambiguity may exist cannot render nugatory restrictions that Congress has imposed");

Natural Res. Def. Council v. Jamison, 815 F. Supp. 454, 471 (D.D.C. 1992) ("Mourning is what

would now be generally recognized as a Chevron 'prong two' case, where the agency exercised

delegated powers in a permissible interpretation of the statute.  By contrast, the present case

---

[14]  To the extent there is an exception to this rule, it exists only in cases where the text of
the statute takes the Court to an "absurd result," hardly the situation here.  See Mova Pharm. Corp.
v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

involves no ambiguity in the statute.").[15]  To conclude otherwise would give an agency essentially

limitless power to write new law, without any regard for the language or legislative history of the

governing statute, so long as it arguably fits within the purposes of the statutory scheme (at least

where, as is often true, there is a provision akin to section 2706(b)(10)).[16]  No court has ever

conferred so sweeping a commission on an administrative agency.[17]  The Court sees no reason to

give it to the NIGC here.[18]

_____

[15]  See also Shays v. FEC, 337 F. Supp. 2d 28, 104 n.81 (D.D.C. 2004) (rejecting Mourning deference because the defendant agency "provides no citation to a case that suggests that a regulation may be salvaged if it is 'reasonably related to the purposes of the enabling statute' even if it fails Chevron step one"), aff'd, 414 F.3d 76 (D.C. Cir. 2005); Fleming Companies, Inc. v. U.S. Dep't of Agric., 322 F. Supp. 2d 744, 756 (E.D. Tex. 2004) ("The court's review under Chevron's second step becomes more deferential if the statute at issue allows an administrative agency to 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act.'").

[16]  See, e.g., 7 U.S.C. § 7281(d) (Agricultural Market Transition Act); 12 U.S.C. § 1701q-1(I) (National Housing Act); 15 U.S.C. § 1717a(g) (Department of Housing and Urban Development Reform Act); 15 U.S.C. § 5723 (Telephone Disclosure and Dispute Resolution Act); 16 U.S.C. § 2109 (e) (Cooperative Forestry Assistance Act); 20 U.S.C. § 9103(f) (National Foundation of the Arts and Humanities Act).

[17]  The D.C. Circuit has repeatedly affirmed, outside of discussions of Mourning, that broad delegations of rule-making authority do not allow an agency to ignore the plain text of a statute.  See, e.g., Plate River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 962 F.2d 27, 33 (D.C. Cir. 1992) (holding that it is "far-fetched" to read a provision that directs agencies to "utilize their authorities in furtherance of the purposes" of the Endangered Species Act to "implicitly supersede" statutory language channeling the agency's powers and thereby authorize an agency "to do 'whatever it takes' to protect the threatened and endangered species"); Public Serv. Comm. of State of New York v. FEC, 866 F.2d 487, 491-92 (D.C. Cir. 1989) (grant of authority to agency "to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of the chapter" does not "overrid[e] the balance achieved" in the rest of the statute -- such authority "cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined").

[18]  The NIGC argues that there will be a regulatory "void" in the absence of federal MICS for Class III gaming.  NIGC Mem. at 5.  This contention seems at least somewhat overstated, given that a tribal ordinance and a tribal-State compact will continue to impose internal control

## 2.        The Indian Canon of Statutory Interpretation

The NIGC also seeks to invoke the canon of statutory interpretation that statutes should be "construed liberally in favor of the Indians."  Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).  NIGC contends that because both the IGRA and the MICS were enacted for the benefit of the Indian tribes, the canon favors a broad interpretation of the statute that permits the NIGC to issue Class III MICS.  The Court disagrees that the canon supports the agency's position in this case, for two separate reasons.

First, the canon only has a role in the interpretation of an ambiguous statute.  See id. at 766 ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.");  Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n, 14 F.3d 633, 637 (D.C. Cir. 1994) ("Which construction of the Act favors the Indians, the one including electronic pull-tab games under class II gaming or the one placing this version of the game under the more restrictive category of class III?  In this case there is no need to choose.  When the statutory language is clear, as it is here, the canon may not be employed.").  A review of the language, the structure, and the legislative history of the IGRA reveals the clear intent of Congress to withhold from the NIGC the power to regulate Class III gaming.  There is accordingly no reason to turn to the Indian canon.  See Negonsott v. Samuels, 507 U.S. 99, 110 (1993) (concluding, upon a review of the text and legislative history of the statute, that "the Kansas Act quite unambiguously confers jurisdiction on the State over major offenses committed by or

---

standards on Class III gaming at Colorado River, and the tribal-State compact actually adopts the existing federal Class III MICS as its minimum internal control standards.  The issue is not whether there will be regulations governing Class III gaming; rather, it is which government body is authorized to issue and enforce such regulations.  In any event, the NIGC's concern of a regulatory void is one that should be directed to Congress, not the courts.

against Indians on Indian reservations, and we therefore have no occasion to resort to this [Indian] canon of statutory construction").[19]

Second, even if there were a role for the canon, it likely would not be to expand the jurisdiction of the NIGC over Class III Indian gaming.  The canon is sometimes described in shorthand as counseling for the interpretation of a statute in favor of the Indians, but it is as often discussed in terms of construing a statute to favor the sovereignty and independence of Indian tribes.  See, e.g., Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 152 (1982) ("[I]f there [is] ambiguity . . . the doubt would benefit the tribe, for ambiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence." (quotation omitted)); City of Roseville v. Norton, 348 F.3d 1020, 1032 (D.C. Cir. 2003) ("[T]he Indian canon requires the court to resolve any doubt in favor of the tribe.").

---

[19]   The role the Indian canon would play in the Chevron analysis is not entirely clear.  As a general rule, the D.C. Circuit has held that "policy-oriented canons of statutory interpretation may not be used to evaluate agency interpretations of ambiguous statutes."  Ober United Travel Agency, Inc. v. U.S. Dep't of Labor, 135 F.3d 822, 825 (D.C. Cir. 1998).  At the same time, the D.C. Circuit has indicated that the Indian canon is an exception to this general rule.  See Cobell v. Norton, 240 F.3d 1081, 1101, 1103 (D.C. Cir. 2001) ("While ordinarily we defer to an agency's interpretations of ambiguous statutes entrusted to it for administration, Chevron deference is not applicable in this case . . . . [T]he canon of liberality of construction in favor of the Indians acts with its 'special strength' even where a federal agency would in other cases enjoy the implied authority to implement ambiguous statutory language supporting a competing interpretation.").  Even so, it is unclear whether the canon operates at Chevron step one, step two, or both.  See Halverson v. Slater, 129 F.3d 180, 184 (D.C. Cir. 1997) ("If employment of an accepted canon of construction illustrates that Congress had a *specific* intent on the issue in question, then the case can be disposed of under the first prong of Chevron.  If, however, the statute is ambiguous, then Chevron step two implicitly precludes courts picking and choosing among various canons of construction to reject reasonable agency interpretations.") (emphasis in original) (quotation omitted)).  Because the IGRA is clear under Chevron step one without recourse to the Indian canon, the Court does not find it necessary to delve any more deeply into this question today.

The distinction between a canon that construes statutes in favor of *Indians*, and one that construes statutes in favor of *Indian tribal sovereignty*, assumes relevance in a case where the government enacts a law that impedes upon tribal independence or sovereignty, and then justifies the law on the ground that it is in the best interest of the tribe.  "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians," County of Oneida v. Oneida Indian Nation of N.Y., 470 U.S. 226, 247 (1985), and in particular the "trust *obligation* that Congress owes to Indian tribes," Artichoke Joe's, 353 F.3d at 729 (emphasis added).  Except in rare instances where it has acted recklessly, the federal government will claim in every case to have the best interests of the Indian tribes in mind.  To hold that the canon always favors the conduct of the federal government in such a circumstance would strip the canon of its salutary role in protecting the position of the Indian tribes in the trust relationship.  See, e.g., United States v. Errol D., Jr., 292 F.3d 1159, 1163 (9th Cir. 2002) ("Because the MCA constitutes an incursion into the tribal sovereignty of Indian tribes, justified by the 'guardianship' powers of Congress, ambiguous provisions in the MCA must be interpreted in favor of the tribes.").

A similar issue was raised in Michigan v. EPA, 268 F.3d 1075, 1085 (D.C. Cir. 2001), where the EPA sought to invoke the Indian canon in support of a regulation extending the Clean Air Act permits program to Indian lands, on the theory that a clean environment "favors Indian interests."  The court concluded that the Indian canon could not be used in this manner:

> EPA is not interpreting 42 U.S.C. §§ 7601(d) and 7661a for the benefit of Indian tribes.  It does not, for example, propose to give Indian tribes jurisdiction over "in question" lands.  Rather it is refusing to make a jurisdictional determination, thereby depriving both tribes and states of the opportunity afforded them by Title V to operate a permitting program. If anything, by claiming independent federal jurisdiction over "in question" areas, EPA is construing these statutes for its own

benefit.

Id.  The Court believes that a similar result would be required here.[20]  The IGRA is clear, and therefore the Court need not resort to the Indian canon.  Were it otherwise, however, the canon would militate against the reading of the IGRA favored by the NIGC, not in its favor.  The MICS for Class III gaming represents a significant incursion on tribal sovereignty, superseding less stringent tribal gaming ordinances and tribal-State compacts and subjecting the tribes to a range of new controls and lengthy audits.  The Court will not read the Indian canon to favor the agency's position simply because the agency is well-intentioned.

## II.    The Fine Imposed in this Action Is Unlawful

The Court concludes that the Class III minimum internal control standards are beyond the statutory authority of the NIGC.  The issue before the Court, however, is not only whether the NIGC may issue the Class III MICS, but whether the NIGC may enforce those standards against Colorado River, and in particular whether the Final Decision and Order imposing a fine on Colorado River for terminating a Class III MICS compliance audit is lawful.  The explicit and only basis for the audit was to assess the tribe's compliance with the Class III MICS.  In fact, the NIGC does not argue that the compliance audit or the fine can be sustained on another ground once the Court concludes that the NIGC lacks the authority to issue MICS.  Thus, the Court concludes that the compliance audit and the fine were also outside the authority of the NIGC.

---

[20]  The Court notes that one district court took a different approach to the Indian canon in Shakopee Mdewakanton Sioux Community v. Hope, rejecting the plaintiff Indian tribe's invocation of the Indian canon because "to the extent that the commission's rule protects the integrity of Indian gaming, it must be seen to advance and not hinder tribal interests." 798 F. Supp. 1399, 1408 (D. Minn. 1992), aff'd, 16 F.3d 261 (8th Cir. 1994).  This Court disagrees with this decision for the reasons stated in the text.

This opinion should not be read to hold that the NIGC will never be able to audit a Class III gaming operation, or that the NIGC may not penalize a tribe that resists a valid audit.  See 25 U.S.C. § 2706(b)(4) ("The Commission . . . may demand access to and inspect, examine, photocopy, and audit all papers, books, and records respecting gross revenues of class II gaming conducted on Indian lands and *any other matters necessary to carry out the duties of the Commission under this chapter*.") (emphasis added); id. 2713(a) ("Subject to such regulations as may be prescribed by the Commission, the Chairman shall have authority to levy and collect appropriate civil fines, not to exceed $25,000 per violation, against the tribal operator of an Indian game or a management contractor engaged in gaming for any violation of any provision of this chapter . . . .").  However, the NIGC does not possess the authority to audit a gaming activity to ensure its compliance with an invalid regulation.  Therefore, the Court concludes that the fine imposed in this action is invalid.

## CONCLUSION

Accordingly, the motion of Colorado River for summary judgment is granted, and the cross-motion of the NIGC for summary judgment is denied.  A separate order will issue.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:  __August 24, 2005__

-40-

Copies to:

Kim Hoyt Sperduto
2021 L Street, NW
Second Floor
Washington, DC 20036
(202) 408-8900
Fax: (202) 408-8910
Email: ksperduto@sperdutolaw.com

Eric N. Shepard
Acting Attorney General
Route 1, Box 23-B
Parker, AZ 85344
(928) 669-1271
Fax: (928) 996-5675
Email: ericnshepard@rraz.net

Gwenellen P. Janov
901 Rio Grande Boulevard, NW
Suite F-144
Albuquerque, NM 87104
(505) 842-8302
Fax: (505) 842-8309
Email: gjanov@janovcooneylaw.com
        *Counsel for plaintiff*

Edward J. Passarelli
Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663
(202) 305-0468
Fax: (202) 305-0506
Email: Edward.Passarelli@usdoj.gov
        *Counsel for defendant*

Scott D. Crowell
Crowell Law Offices
1670 Tenth Street, West
Kirkland, WA 98033
828-9070
        *Counsel for Amici Curiae Confederated Tribes of Siletz Indians of Oregon et al.*

David S. Black
Holland & Knight LLP
1600 Tysons Boulevard
McLean, VA 22102-4867
(703) 720-8600
Fax: 703-720-8610
Email: david.black@hklaw.com
        *Counsel for Amicus Curiae National Indian Gaming Association*

Jennifer L. Nutt Carleton
P.O. Box 109
N7210 Seminary Road
Oneida, WI 54155
(920) 869-4327
        *Counsel for Amicus Curiae Oneida Tribe of Indians of Wisconsin*